**METRONET SERVICES CORPORA-TION; MetroNet Telemanagement Corporation, Plaintiffs–Appellants,**

v.

**QWEST CORPORATION, Defendant–Appellee.**

No. 01–35406.

United States Court of Appeals, Ninth Circuit.

Sept. 24, 2004.

James L. Phillips, Miller Nash LLP, Seattle, WA, for the plaintiffs-appellants.

Thomas L. Boeder, Julia Parsons Clarke and Brent Snyder, Perkins Coie LLP, Seattle, WA, for the defendant-appellee.

Jonathan M. Askin, Association for Local Telecommunications Services, Washington, D.C., and James E. Hartley, Thomas P. Howard and Thorvald A. Nelson, Holland & Hart LLP, Denver, CO, for amicus curiae Association for Local Telecommunications Services.

Before BROWNING, FISHER and TALLMAN, Circuit Judges.

FISHER, Circuit Judge:

The Supreme Court vacated our prior decision in this antitrust case, *MetroNet Serv's Corp. v. U S West Communications*, 329 F.3d 986 (9th Cir.2003), and remanded for further consideration in light of its recent decision in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). *Qwest Corp. v. MetroNet Serv's Corp.*, —— U.S. ——, 124 S.Ct. 1144, 157 L.Ed.2d 1040 (2004). Qwest Corp., formerly U S West Communications, is the incumbent local exchange carrier ("ILEC") serving the state of Washington.[1] After Qwest offered volume discounts on phone services to businesses with more than 20 phone lines, MetroNet Services Corp. and MetroNet Telemanagement Corp. (collectively "MetroNet") began purchasing those services from Qwest and reselling them to small businesses with 20 or fewer phone lines. MetroNet received the volume discounts by aggregating the phone lines of these small busi-

nesses. In 1997, in order to eliminate resale of its services, Qwest changed the pricing structure of its calling features and required that customers have at least 21 lines at each location in order to receive the volume discount.

In 2000, MetroNet filed suit alleging that Qwest violated Section 2 of the Sherman Act by illegally maintaining a monopoly over the market for small business local telephone services in the Seattle/Tacoma area, and by denying MetroNet access to an essential facility.[2] After MetroNet and Qwest engaged in settlement discussions, MetroNet moved to enforce a written, unsigned settlement agreement. The district court denied the motion and subsequently granted summary judgment in favor of Qwest on the remaining antitrust claims. In our original decision, we reversed the grant of summary judgment and affirmed the denial of MetroNet's motion to enforce its settlement agreement with Qwest.

In light of *Verizon*, we now affirm summary judgment in favor of Qwest. MetroNet cannot prove an essential facilities claim, because the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), 47 U.S.C. § 151 *et seq.* ("1996 Act"), provides the means for MetroNet to obtain access to Qwest's local exchange network. In addition, Qwest's change in pricing in order to eliminate arbitrage does not amount to exclusionary conduct under the Supreme Court's refusal to deal precedents as interpreted by *Verizon*. Finally, we decline to expand antitrust liability to encompass MetroNet's claims because of their novel nature, the existence of a regulatory structure designed to deter and

---

1. We refer to Qwest Corp. and its predecessors simply as "Qwest."

2. MetroNet also asserted a state law cause of action for breach of contract and the implied covenant of good faith and fair dealing. This cause of action was dismissed without prejudice by the district court on May 2, 2000 and is not before us.

remedy anticompetitive harm and the record of the regulatory agency's attentiveness to the anticompetitive conduct alleged in this antitrust suit.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Qwest sells two types of business phone services relevant to this antitrust suit: flat-rate local exchange called "1FB"[3] and "Centrex." Centrex consists of two components: multiple telephone line access that allows a company's employees to make internal calls using a four-digit extension and external calls via the Qwest central office switch (the access component), and calling features such as call forwarding, call waiting and call hold (the features component).[4] Although each component is priced separately, Qwest sells them as one bundled service, requiring customers who buy one component to buy the other as well.[5]

Qwest originally developed Centrex for the large business market as an alternative to private branch exchange ("PBX"), a switch owned by large businesses and located on their property.[6] Qwest initially offered volume discounts to large businesses with more than 20 phone lines. Small businesses with 20 or fewer lines could purchase Centrex without the discount, or purchase 1FB lines from Qwest as well as features for an additional fee.[7]

Qwest priced Centrex on a "per system basis," *i.e.* based on the number of phone lines included in the Centrex package, regardless of whether those lines ran to a single location or multiple, separate locations. This "system pricing" scheme allowed resellers to receive the volume discounts by aggregating the telephone lines of several variously located small businesses. As early as 1985, MetroNet and other resellers began purchasing volume discounted Centrex lines from Qwest and reselling them to aggregations of small businesses, each with 20 lines or fewer. MetroNet sold Centrex at a price above what it cost MetroNet to purchase Centrex from Qwest but below what MetroNet's customers would have had to pay for 1FB lines plus features.

By 1991, Qwest had taken note of the significant resale market for Centrex created by the differential pricing of Centrex and 1FB lines. Qwest sought to introduce a new version of Centrex, Centrex Plus, with a pricing structure designed to eliminate or reduce the arbitrage between Centrex and 1FB lines. Under the new "per location pricing" structure, Qwest required customers to have more than 20 lines *at each location* in order to receive a volume discount for the service to that location. Because the resellers' customers have 20 or fewer lines, Qwest's shift to per location pricing eliminated the resellers' ability to obtain the Centrex volume discounts.

The Washington Utilities and Transportation Commission ("WUTC") is author-

---

**3.** "F" stands for "flat-rate" and "B" stands for "business." Flat-rate residential service is known as "1FR."

**4.** MetroNet stresses that the access component itself consists of two sub-components: the physical line between the customer and Qwest's switch, called the network access channel ("NAC"), and a device that limits the number of lines that have access, called the network access register ("NAR"). Because our analysis does not depend on this further level of detail, we do not refer to it in the text.

**5.** MetroNet has not alleged or argued that Qwest has engaged in illegal tying.

**6.** A PBX allows four-digit internal calling and can provide some features. External dialing is done through Qwest's local network using a "trunk line" that connects the customer's PBX to the Qwest network.

**7.** It is unclear from the record whether small business customers choosing to purchase 1FB lines could also buy features from providers other than Qwest.

ized to regulate the rates, services, facilities and practices of telecommunications companies in the state of Washington. Wash. Rev.Code § 80.01.040(3)(2004). Qwest filed tariff changes with the WUTC for the new per location pricing structure, which would apply not only to the features component of Centrex, but also to the access component.[8] The WUTC conditionally approved per location pricing of Centrex Plus on November 18, 1993, and finally approved it on November 30, 1994. However, a year and a half later, on April 11, 1996, the WUTC abolished per location pricing and ordered that system pricing be reinstated. Qwest viewed the WUTC order as "exasperating dramatically the existing revenue arbitrage situation" and appealed. The Washington Supreme Court upheld the WUTC order. *U S West Communications, Inc. v. Wash. Utils. & Transp. Comm'n*, 134 Wash.2d 74, 949 P.2d 1337, 1364 (1998).

In December 1996, with system pricing back in place, Qwest concluded that:

> The current Washington tariff structure for Centrex Plus, [1FB], and features offers a profitable, relatively low risk opportunity for Centrex resellers to win significant market share of 1FB customers (mainly small business) in Washington. In essence, it appears that resellers can operate with positive margins while reselling [Centrex] at anywhere from 10 to 35 percent discounts to [1FB lines], not including features.

Qwest estimated that it was losing more than $300,000 in revenues per month to MetroNet and other resellers, and that the revenue loss was having a "significantly negative" impact on profitability. In addition to these financial concerns, Qwest was greatly troubled that the loss of its direct relationship with customers due to resale would deprive it of the opportunity to cross-sell additional products and services. Qwest concluded that "no existing or forthcoming product ... effectively addresses Centrex resale competition," and set about developing strategies to win back market share. On April 18, 1997, Qwest filed a price list with the WUTC reinstating per location pricing for the features component of Centrex. This later imposition of per location pricing is the subject of the present suit.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there exist any genuine issues of material fact and whether the district court correctly applied the substantive law. *Id.* We may not weigh the evidence or determine the truth of the matter; rather, we may determine only whether there is a genuine issue for trial. *Id.* at 1054.

## III. ESSENTIAL FACILITIES

■ MetroNet claims that Qwest denied resellers like MetroNet access to its local exchange network, an essential facility, by eliminating opportunities for Centrex resale. "The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir.1988). In order to prevail on its essential facilities claim, MetroNet must prove (1) that Qwest is a monopolist in control of an essential facility, (2)

---

**8.** To be more precise, the per location pricing scheme applied to the NAC subcomponent of Centrex access, not the NAR subcomponent. *See* note 4 *supra*.

that MetroNet, as Qwest's competitor, is unable reasonably or practically to duplicate the facility,[9] (3) that Qwest has refused to provide MetroNet access to the facility and (4) that it is feasible for Qwest to provide such access.[10] *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir.1992).

Even though the essential facilities doctrine is followed in this and other circuits, the Supreme Court has "never recognized such a doctrine." *Verizon,* 124 S.Ct. at 881. In *Verizon,* the Court found "no need either to recognize [the doctrine] or to repudiate it" because the Court concluded that the plaintiff could not state a claim under the doctrine. *Id.* The Court reasoned "the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." *Id.* Thus, "essential facility claims should ... be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* (quoting Areeda & Hovenkamp, Antitrust Law ¶ 773e, at 150 (2003 Supp.)).

▪ The Court's reasoning in *Verizon* compels affirmance of the district court's grant of summary judgment with respect to MetroNet's essential facilities claim. MetroNet cannot establish the first element of its claim, because the 1996 Act provides the WUTC with the effective power to compel Qwest to share its local exchange network with competitors. Specifically, under the 1996 Act, a requesting competitive local exchange carrier

("CLEC") can obtain access to an incumbent carrier's network in three ways: "[i]t can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the [ILEC's] network 'on an unbundled basis'; and it can interconnect its own facilities with the [ILEC's] network." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *see* 47 U.S.C. § 251(c)(2)-(4)(2004). The incumbent carrier can negotiate an agreement with the competitive carrier without regard to the duties it would otherwise have under § 251(c), but if private negotiations fail, either party can petition the relevant state commission to arbitrate unresolved issues. *See* 47 U.S.C. § 252 (2004); *AT & T,* 525 U.S. at 372–73, 119 S.Ct. 721. Thus, "[t]he 1996 Act's extensive provision for access makes it unnecessary to impose a judicial doctrine of forced access." *Verizon,* 124 S.Ct. at 881; *see Covad Communications Co. v. BellSouth Corp.*, 374 F.3d 1044, 1050 (11th Cir.2004) ("Where a state or federal agency is authorized to compel access to a competitor's infrastructure, as under the [1996 Act], [*Verizon* ] states that an essential facilities claim should be denied.").

▪ MetroNet contends that the compelled sharing provisions of the 1996 Act are irrelevant here because they have no effect on MetroNet's resale business. This argument misapprehends the purpose of the essential facilities doctrine. The doctrine makes a facility that is essential to competition in a given market available to competitors so that they may compete in that market. A facility is "essential" only if it is *"otherwise unavailable* and cannot

---

9. "[T]he second element is effectively part of the definition of what is an essential facility in the first place. That is to say, if the facility can be reasonably or practically duplicated it is highly unlikely, even impossible, that it will be found to be essential at all." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir.1992).

10. "[T]he fourth element basically raises the familiar question of whether there is a legitimate business justification for the refusal to provide the facility." *City of Anaheim,* 955 F.2d at 1380.

be reasonably or practically replicated." *City of Anaheim*, 955 F.2d at 1380 (emphasis added). The doctrine does not guarantee competitors access to the essential facility in the most profitable manner. Even assuming that MetroNet can no longer profitably buy Centrex in the retail market and resell it to small businesses, MetroNet can still obtain access to Qwest's local exchange network through the compelled sharing provisions of the 1996 Act. *See* 47 U.S.C. § 251(c). Because reasonable access to the essential facility exists—even if not in a way that is conducive to MetroNet's existing business model—MetroNet cannot establish an essential facilities claim.

MetroNet also argues that the WUTC has no *effective* power to compel sharing due to the realities of the regulatory scheme. MetroNet relies on testimony by its expert that Qwest has considerable latitude in setting prices because of the WUTC's limited statutory authority, limited resources and other constraints of the regulatory process. Even were we to credit this testimony and find that the WUTC is unable to regulate *prices*, this would not show that the WUTC lacks effective power to compel *sharing*. The WUTC's statutory authority to compel sharing stems from the same 1996 Act provisions that the Court relied upon in *Verizon* to reject the plaintiff's essential facilities argument. *See Verizon*, 124 S.Ct. at 876. Moreover, the record shows that Qwest has entered into an interconnection agreement with MetroNet and that other telecommunications carriers have successfully petitioned the WUTC to arbitrate and approve interconnection agreements with Qwest. Thus, we conclude that the WUTC has the effective power to compel sharing under the 1996 Act.

## IV. MONOPOLIZATION

■ We must also consider the impact of *Verizon* on MetroNet's monopolization claim under Section 2 of the Sherman Act. *See* 15 U.S.C. § 2 (2004) (making it illegal to "monopolize . . . any part of the trade or commerce among the several States"). To prevail on this claim, MetroNet must prove that Qwest (1) possessed monopoly power in the relevant market, (2) wilfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury. *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir.1997). *Verizon* does not address the meaning of monopoly power or antitrust injury, but does examine the element of exclusionary conduct.[11] *See Verizon*, 124 S.Ct. at 879.

---

**11.** MetroNet argues that *Verizon* has no impact on its case because of the differences in procedural posture. *Verizon* was decided on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), *see Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 305 F.3d 89, 95–96 (2d Cir.2002), whereas the district court resolved this case on a motion for summary judgment. MetroNet says that our previous conclusion that it had created triable issues of fact is not disturbed by *Verizon*.

Nonetheless, *Verizon* affected whether Qwest's conduct can be considered anticompetitive as a matter of law. *See Verizon*, 124 S.Ct. at 879; *see also SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir.1996) ("Whether specific conduct is anticompetitive is a question of law reviewed de novo."). Contrary to MetroNet's contention, the procedural differences, if anything, make it more difficult for MetroNet's claims to survive summary judgment because the Court's dismissal in *Verizon* implied that the plaintiff could prove no set of facts that would entitle it to relief. *See id.* ("A complaint should not be dismissed [under Rule 12(b)(6) ] unless it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Thus, *Verizon* raises the threshold with respect to the facts that MetroNet must plead and prove to establish an antitrust violation.

## A. Refusal to deal

The Court in *Verizon* stated that as a general matter "there is no duty to aid competitors." *Id.* at 881. It articulated three reasons for this general proposition. First,"[c]ompelling ... firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 879. Second, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are illsuited." *Id.* Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*

Although recognizing that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2," the Court noted that it has been "very cautious in recognizing such exceptions." *Id.* The Court concluded that *Verizon* did not fit within the existing exceptions carved out by *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), or *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

In *Aspen Skiing,* the defendant owned three of the four mountains in the Aspen, Colorado ski area, and the plaintiff owned the fourth mountain. They had jointly offered for many years a multiple-day, multiple-area ticket that gave skiers admission to all of the mountains (the "joint ticket"). *Aspen Skiing,* 472 U.S. at 589–90, 105 S.Ct. 2847. The joint ticket was often cheaper than purchasing multiple single-day tickets. *Id.* at 589, 105 S.Ct. 2847. Revenues from the joint ticket were divided between the parties according to the relative percentage that buyers with the joint ticket used each mountain. *Id.*

The defendant decided to discontinue the joint ticket by giving the plaintiff "an offer that it could not accept": the defendant would continue participating in the joint ticket only if the plaintiff agreed to receive a fixed percentage of joint ticket revenues that was considerably lower than the historical average based on actual usage of the fourth mountain. *Id.* at 592, 105 S.Ct. 2847. After the plaintiff rejected the offer, the defendant sold a joint ticket featuring only its three mountains. *Id.* at 593, 105 S.Ct. 2847. The plaintiff attempted to market its own multiple-day, multiple-area package by offering ski passes to the fourth mountain along with vouchers, each equal to the retail price of a single-day ticket to one of the defendant's mountains. *Id.* at 593–94, 105 S.Ct. 2847. The defendant refused to accept these vouchers and to sell any lift tickets to the plaintiff at retail price. The Supreme Court upheld a jury verdict in favor of the plaintiff on its claim that the defendant had monopolized the market for downhill skiing services in Aspen. *Id.* at 605, 105 S.Ct. 2847.

In *Verizon,* the Court explained *Aspen Skiing* in this way:

> The Court ... found significance in the defendant's decision to cease participation in a cooperative venture. The unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent.

*Verizon,* 124 S.Ct. at 879–80 (citations omitted). The Court then distinguished *Verizon* from *Aspen Skiing.* Because there were no allegations that Verizon had "voluntarily engaged in a course of dealing with its rivals, or would ever have done so

absent statutory compulsion," Verizon's prior conduct "shed[ ] no light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice." *Id.* at 880. The Court also observed that "[i]n *Aspen Skiing,* what the defendant refused to provide to its competitor was a product that it already sold at retail," whereas in *Verizon,* "the services allegedly withheld are not otherwise marketed or available to the public." [12] *Id.* Thus, the Court "conclude[d] that Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id.; see also Covad,* 374 F.3d at 1048.

MetroNet attempts to fit the present case into *Aspen Skiing's* exception to the general "no duty to deal" rule. Although this case is similar in certain respects, it does not fit comfortably in the *Aspen Skiing* mold. The circumstances that *Verizon* found significant for creating antitrust liability are not present here.

■ The first fact found relevant in *Verizon* was the unilateral termination of a voluntary and profitable course of dealing. *Verizon,* 124 S.Ct. at 880. In the Court's view, this fact "suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* Here, although Qwest voluntarily sold Centrex to its customers, including resellers like MetroNet, on a per system price from 1985 to 1991, Qwest attempted to change this prior course of dealing after it realized that the resale of Centrex by MetroNet and others was having a "significantly negative" impact on its own profitability. Hence,

Qwest was not forsaking short-term profits by switching from system pricing to per location pricing, but rather was attempting to increase its short-term profits. Qwest's termination of its prior course of dealing therefore "sheds no light" upon whether Qwest was "prompted not by competitive zeal but by anticompetitive malice." *Id.*

■ The second fact in *Aspen Skiing* to which *Verizon* attached significance was the defendant's refusal to sell tickets to the plaintiff *"even if compensated at retail price,"* thus "suggesting a calculation that its future monopoly retail price would be higher." *Id.* Similar to the unilateral termination of a prior profitable course of dealing, the defendant's refusal to sell to the plaintiff at the prevailing retail price, in the Court's view, indicated a willingness to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition. *See Aspen Skiing,* 472 U.S. at 608, 105 S.Ct. 2847. Here, Qwest has been willing to sell and has sold Centrex to MetroNet at its retail price. However, Qwest has set its retail price in a way that has made it unprofitable for MetroNet to buy and resell Centrex.[13] Thus, Qwest's per location pricing is analogous to the offer that the defendant in *Aspen Skiing* made to the plaintiff—an offer that the defendant anticipated would not be profitable for the plaintiff to accept. An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal. *Cf. Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 179–80 (2d Cir.1990) (holding that even if there is no "outright refusal to deal," a denial of an essential

---

**12.** The Court also distinguished *Otter Tail* on this basis. *See Verizon,* 124 S.Ct. at 880.

**13.** The record contains conflicting evidence about MetroNet's profitability after Qwest im-

plemented per location pricing in 1997, but we take the facts in the light most favorable to MetroNet as we must on summary judgment.

facility can occur "if the terms of the offer to deal are unreasonable").

Nonetheless, Qwest's choice to switch to per location pricing does not have the same economic significance as the defendant's refusal to sell to the plaintiff at the retail price in *Aspen Skiing.* Qwest's switch to per location pricing does not entail a sacrifice of short-term benefits. Rather, it enables Qwest to maintain a price discrimination structure established before resellers entered the market for local telephone services.[14] Because Qwest voluntarily implemented the volume discount pricing structure before Centrex resale began to undercut its sales to small businesses, that pricing structure was presumably maximizing Qwest's profits. Therefore, by price discriminating through per location pricing, Qwest has not set its retail price at an unprofitable level in the short run merely to exclude competition in the long run.

The third fact the Court emphasized in *Verizon* was that the defendants in *Aspen Skiing* and *Otter Tail* refused to provide to their competitors products that were already sold in a retail market to other customers. *Verizon,* 124 S.Ct. at 880. The importance of this fact relates to the Court's concern about the administrability of a judicial remedy. One of the reasons for a general "no duty to deal" rule is that enforced sharing "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* at 879. If the defendant already sells the product in an existing market to certain customers but merely refuses to sell to its competitors, the court can impose a judicial remedy that does not require the court to "assume the day-to-day controls characteristic of a regulatory agency." *Id.* at 883 (quoting Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles,* 58 Antitrust L.J. 841, 853 (1989)). The court can simply order the defendant to deal with its competitors on the same terms that it already deals with others in the existing retail market, without setting the terms of dealing. In contrast, if the defendant does not already provide the product in an existing market or otherwise make it available to the public, the court will have to delineate the defendant's sharing obligations, and "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations." *Id.*

In this case, Centrex is a service already sold in a retail market. Qwest, however, has not refused to sell this retail service to MetroNet, but has sold it to MetroNet on the same terms that it sells to direct consumers.[15] Like direct consumers, MetroNet must have more than 20 lines at the same location in order to receive a volume discount on Centrex features. Thus, MetroNet is essentially asking this court to "identify[ ] the proper price" that Qwest should charge in the retail market—a role

---

14. Price discrimination describes the practice of charging different prices to different customers for essentially the same product or service. More technically, price discrimination occurs when a firm sells to different groups of customers at differing ratios of price to marginal cost. *See* 3 Areeda & Hovenkamp, Antitrust Law ¶ 721b, at 262 (2d ed.2002). It appears that Qwest is able to price discriminate among consumers because small businesses have a lower elasticity of demand than large businesses. In other

words, large businesses are more sensitive to changes in price due to the availability of substitutes to Centrex, namely PBXs. Small businesses are willing to pay a higher price for Centrex because fewer substitutes for Centrex are available to them.

15. Qwest discriminates in price among different types of direct consumers (small businesses versus large businesses) but does not discriminate between competitors and direct consumers.

the Supreme Court has deemed courts ill suited to perform. *Id.* at 879.

In sum, *MetroNet* does not fall within the *Aspen Skiing* exception to the general "no duty to deal" rule, because Qwest's switch to per location pricing does not entail a sacrifice of short-term profits for long-term gain from the exclusion of competition and because Qwest has not refused to deal with MetroNet on the same terms that it deals with direct consumers. Therefore, MetroNet does not have an actionable antitrust claim under the Supreme Court's existing refusal to deal precedents as explained and limited by *Verizon.*

**B. Elimination of arbitrage**

■ In our previous decision, we did not rely on the existing refusal to deal doctrine to conclude that Qwest could be liable under the Sherman Act for monopolization. *MetroNet,* 329 F.3d at 1006–08. Instead, analogizing to cases which had condemned collaborative efforts to eliminate discounters, we extended antitrust liability to Qwest's unilateral attempt to eliminate discount resellers like MetroNet. *Id.* at 1007. *Verizon* teaches, however, that the regulatory context is an important consideration in "deciding whether to recognize an expansion of the contours of § 2." *Verizon,* 124 S.Ct. at 881.[16] To determine whether we should expand the contours of Section 2 liability in a regulated industry, we must weigh the "benefits of antitrust intervention" against "a realistic assessment of its costs." *Id.* at 882.

With regard to the benefits of antitrust intervention, we recognize that imposing antitrust liability on sellers who unilaterally attempt to eliminate resellers can deter attempts to eliminate arbitrage that is beneficial to consumer welfare. A reseller can engage in arbitrage when a seller price discriminates among its consumers. In particular, if a seller charges a higher price to some consumers (the "disfavored consumers") and a lower price to others (the "favored consumers"), a reseller can take advantage of this price differential by buying the product or service at the lower price intended for the favored consumers and reselling it to the disfavored consumers at a price below the price the seller charges the disfavored consumers. *See* 3 Areeda & Hovenkamp, Antitrust Law ¶ 721b, at 263 (2d ed.2002).

Prohibiting sellers from eliminating arbitrage thus can enhance consumer welfare under certain conditions. For instance, if the seller's increase in profits from a greater number of sales due to the discounted price outweighs the loss in profits from the decrease in sales at the higher price due to customers switching to the reseller, the seller would find it profitable to continue to offer the product or service at a discounted price despite the presence of arbitrage and an inability to eliminate it. Consequently, favored consumers would still be able to purchase the product or service at the lower discounted price from the seller. In addition, some disfavored consumers who were willing to pay the seller's higher price could buy the product or service at a lower price from the reseller, and other disfavored consumers who were unwilling to pay the seller's higher price might be willing to buy the product at the reseller's lower price. Under these conditions, deterring the seller from eliminating arbitrage would increase consumer welfare and allocative efficiency.

■ In *Verizon,* however, the Supreme Court noted that where "a regulatory structure designed to deter and remedy anticompetitive harm ... exists, the addi-

---

**16.** The Supreme Court recognized, however, that the regulatory scheme created by the 1996 Act does not shield regulated entities from antitrust scrutiny altogether under the doctrine of implied immunity. *Verizon,* 124 S.Ct. at 878.

tional benefit to competition provided by antitrust enforcement will tend to be small." 124 S.Ct. at 881. Such a regulatory structure exists in this case. Under the Washington regulatory scheme, Qwest must file tariff schedules with the WUTC regarding its rates, which must be "fair, just, reasonable and sufficient," and may not change its filed tariff rates unless it gives 30 days notice to the WUTC and the public. Wash. Rev.Code §§ 80.36.080, .100, .110(1)(a). The WUTC can suspend proposed changes within this 30–day period or before they are due to go into effect, whichever is later. *Id.* § 80.36.110(1)(a). In addition, the WUTC may on its own initiative or upon complaint hold a hearing to determine whether the rates being charged are "unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law." *Id.* §§ 34.05.413, 80.36.140. If the WUTC finds in the affirmative, it "shall determine the just and reasonable rates" and fix such rates by order. *Id.* § 80.36.140.

The WUTC may classify a telecommunications service as competitive if it is subject to "effective competition," which "means that customers of the service have reasonably available alternatives and that the service is not provided to a significant captive customer base." *Id.* § 80.36.330(1). The WUTC may require a competitive service to be provided under a price list, and 10 days notice must be given to the WUTC and customers for changes to rates filed in a price list. *Id.* § 80.36.110(1)(b), .330(2). Moreover, the WUTC "may investigate prices for competitive telecommunications services upon complaint," in which case Qwest would have to prove that the prices charged are "fair, just, and reasonable." *Id.* § 80.36.330(4). The WUTC may also "re-classify any competitive telecommunications service if reclassification would protect the public interest." *Id.* § 80.36.330(7).

In addition to the regulatory structure that exists, the record shows that the WUTC has been attentive to Qwest's attempts to eliminate Centrex resale and to price discriminate through per location pricing. The WUTC classified Centrex features as a competitive service in 1987 after hearing testimony from Dr. Nina Cornell, MetroNet's expert in this case, that Qwest's ability to price discriminate prevented effective competition. The WUTC nevertheless concluded that Centrex features were subject to effective competition. In 1992, after Qwest filed a price list revision to implement per location pricing for Centrex, the WUTC on its own initiative issued a complaint and instituted an investigation into whether Centrex features should be reclassified as noncompetitive. After conducting several days of hearings, the WUTC found that reclassifying Centrex features as noncompetitive would not protect the public interest. In 1995, the WUTC suspended Qwest's tariff revisions and ordered Qwest to refile tariffs for Centrex without the per location requirement, which Qwest did. When Qwest filed a price list in 1997 re-implementing per location pricing for Centrex *features,* the WUTC held an open meeting during which MetroNet urged the WUTC to reject the price list, arguing that the per location pricing was designed to eliminate resellers and was thus inconsistent with the WUTC's prior orders.[17] Despite this testimony, the WUTC accepted its staff's recommendation to allow the price list to go into effect without taking any action.

---

17. There is no evidence in the record, however, that MetroNet filed a petition to reclassify Centrex features as a noncompetitive service or a complaint that per location pricing for Centrex features was unfair, unjust or unreasonable.

In sum, the record demonstrates that the WUTC has been attentive to Qwest's attempts to eliminate resale through per location pricing and has taken corrective action when it found Qwest's conduct to be in violation of the regulatory framework. Thus, the additional benefits of antitrust intervention would tend to be small given the existence of a regulatory structure designed to deter and remedy anticompetitive harm and the record of the WUTC's attentiveness to the alleged anticompetitive conduct. *See Verizon,* 124 S.Ct. at 881–82; Areeda & Hovenkamp, Antitrust Law ¶ 242, at 39 (2004 Supp.).

On the other side of the scale, the costs from antitrust intervention might be significant. Prohibiting a seller from eliminating arbitrage can diminish consumer welfare and allocative efficiency in the long run under some circumstances. For instance, a seller may charge different prices to favored and disfavored consumers in order to recover the common costs of serving both sets of consumers. *See* Einer Elhauge, *Why Above–Cost Price Cuts to Drive Out Entrants are not Predatory— and the Implications for Defining Costs and Market Power,* 112 Yale L.J. 681, 732–33 (2003). If the seller cannot eliminate arbitrage, its sales to the disfavored (and higher-paying) consumers might be significantly—if not completely—undercut by the reseller to the extent that the seller can no longer recoup its common costs. As a result, the seller might choose not to incur common costs that are necessary for the development of economically beneficial facilities.

Alternatively, the seller might choose not to offer a discounted price in the first place and instead charge a uniform price to all consumers. If the uniform price it would set is as high as the price the seller would have charged the disfavored consumers if price discrimination could be maintained, consumer welfare would diminish. All consumers, including those who otherwise would have been favored if price discrimination were sustainable, would have to pay the high uniform price, and some potential consumers who are not willing to pay the high uniform price but would have been willing to pay a lower price that is above the marginal cost to provide the service or product would forgo it. *See* 3 Areeda & Hovenkamp, Antitrust Law ¶ 721d1, at 266–68 (2d ed.2002). Hence, consumer welfare would diminish, and allocative efficiency would be distorted.

Although courts ideally would not impose antitrust liability on a seller for eliminating arbitrage under such circumstances, a mistaken inference by a factfinder in an antitrust suit could result in the false condemnation of an attempt to preserve a price discrimination scheme that increases consumer welfare or allocative efficiency. The Court observed in *Verizon* that "[m]istaken inferences and the resulting false condemnations are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Verizon,* 124 S.Ct. at 882 (internal quotation marks omitted). Here, a false condemnation could hurt the very interest the antitrust laws seek to protect—consumer welfare. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("Congress designed the Sherman Act as a 'consumer welfare prescription.' ") (quoting Robert H. Bork, The Antitrust Paradox 66 (1978)); *accord Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th Cir.1995). Moreover, the risk of false condemnations and the resulting imposition of treble damages in private suits may be enough to deter sellers from attempting to eliminate arbitrage that is not beneficial to consumer welfare or from engaging in socially desirable price discrimination in the first place. Thus,

"[t]he cost of false positives counsels against an undue expansion of § 2 liability." *Verizon,* 124 S.Ct. at 882.

We recognize that a unilateral attempt by a seller to eliminate arbitrage can result in anticompetitive harm. If "[t]here [were] nothing built into the regulatory scheme which performs the antitrust function, the benefits of antitrust [would be] worth its sometimes considerable disadvantages." *Id.* at 881 (internal citation and quotation marks omitted). Even in the presence of such a regulatory scheme, a plaintiff may be able to pursue an antitrust claim based on existing antitrust standards. *See Covad,* 374 F.3d at 1052 (reversing the dismissal of a price squeeze claim after *Verizon* ). However, given the novel nature of MetroNet's claims, the regulatory structure that exists and the record of agency action in this case—and guided by *Verizon*—we decline to expand the scope of Section 2 liability to Qwest's attempts to eliminate arbitrage by MetroNet.

## V. CONCLUSION

We affirm the district court's grant of summary judgment on MetroNet's essential facilities and monopolization claims. We also affirm the denial of MetroNet's motion to enforce its purported settlement agreement with Qwest for the reasons stated in our previous opinion. *See Metro-Net,* 329 F.3d at 1013–15. In all other respects, our prior opinion is superseded by our opinion today. Each party shall bear its own costs.

**AFFIRMED.**