**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AEROTEC INTERNATIONAL, INC., an Arizona corporation, *Plaintiff-Appellant*, | No. 14-15562 |
| | D.C. No. 2:10-cv-00433-JWS |
| v. | |
| HONEYWELL INTERNATIONAL, INC., a Delaware corporation, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted March 16, 2016
San Francisco, California

Filed September 9, 2016

Before: M. Margaret McKeown, Kim McLane Wardlaw,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Antitrust

The panel affirmed the district court's grant of summary judgment in favor of defendant Honeywell International, Inc., on antitrust claims brought by Aerotec International, Inc.

Aerotec, a small, independent company that provides maintenance, repair, and overhaul services for Honeywell-manufactured auxiliary power units for aircraft, alleged that Honeywell leveraged its monopoly power over the auxiliary power unit parts market to unfairly smother competition in the repair services market.

The panel held that Aerotec failed to establish either positive or negative tying in violation of § 1 of the Sherman Act because there was no condition linking the sale of a tying product with the sale of the tied product. Aerotec also presented insufficient evidence of exclusive dealing under Sherman Act § 1.

As to monopolization claims under Sherman Act § 2, Areotec failed to establish foreclosure of competition through a refusal to deal or a denial of essential facilities. Aerotec also failed to establish liability on the basis of bundled parts and repairs.

The panel affirmed the district court's summary judgment on a price discrimination claim under the Robinson-Patman

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Act because Aerotec failed to establish actionable discrimination in price between independent servicers and Honeywell's affiliates.

---

**COUNSEL**

Michael C. Blair (argued) and Craig M. LaChance, Baird, Williams & Greer, LLP, Phoenix, Arizona, for Plaintiff-Appellant.

William J. Maledon (argued), Brett L. Dunkelman, Joseph N. Roth, and Eric M. Fraser, Osborn Maledon, P.A., Phoenix, Arizona; Richard G. Parker, O'Melveny & Myers LLP, Washington, D.C.; for Defendant-Appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

This case reads like an antitrust primer for aftermarket issues, with claims for exclusive dealing, tying, essential facilities, refusal to deal, price bundling, and price squeezing under Sections 1 and 2 of the Sherman Act and differential pricing/price discrimination under the Robinson-Patman Act. Honeywell International Inc. ("Honeywell") is one of the world's two largest manufacturers of auxiliary power units ("APUs"), which power aircraft functions such as electricity and temperature. Aerotec International Inc. ("Aerotec") is a small, independent company that provides maintenance, repair, and overhaul ("MRO") services for Honeywell APUs. Aerotec argues that Honeywell leverages its monopoly power

over the APU parts market to unfairly smother competition in the repair services market.

Aerotec's antitrust claims fail for lack of evidence to link Aerotec's misfortune to any cognizable basis for antitrust liability. This case serves as a reminder that anecdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition—the bellwether of antitrust—is insufficient to defeat summary judgment. As the Supreme Court reminds us, "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *see also Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2007) (reiterating that "antitrust laws protect the process of competition, and not the pursuits of any particular competitor"). We affirm the district court's grant of summary judgment in favor of Honeywell.

## BACKGROUND

This case concerns the repair and maintenance market for APUs, which are small engines that provide aircraft with the electrical power needed to keep air conditioning running, cabin lights shining, and electric-powered instrumentation functioning. Without APUs, air travel would be neither comfortable nor safe. A malfunctioning APU requires that a plane be grounded until the problem is fixed—a situation that can cost airlines hundreds of thousands of dollars a day. In short, APUs are an essential cog in a smoothly functioning aviation industry.

Very few companies manufacture APUs.  Honeywell, a diversified manufacturer of aerospace products, dominates the APU industry, with a 76 percent share of the manufacturing market for commercial aircraft, 89 percent for business planes, and 79 percent for military aircraft.  The other major manufacturer is Hamilton Sundstrand.

Aerotec is a small APU shop that competes with Honeywell in the repair market.  Aerotec's share of the repair market is about 1 percent, and it is one of the few firms that repairs APUs from both Honeywell and Hamilton Sundstrand.  Aerotec shares the stage with at least 49 other MRO servicers, plus Honeywell, which alone repairs as much as 54 percent of Honeywell-manufactured APUs.

The lifeblood of the repair and maintenance market is a steady source of replacement parts.  Because of the proprietary nature of the design, manufacturers naturally control most of the replacement parts market for APUs.  The industry denotes replacement parts branded by the manufacturer as "original equipment manufacturer" ("OEM") parts, in contrast with substitute parts, which are referred to as "parts manufacturing approval" ("PMA") parts because they require regulatory certification by the Federal Aviation Administration ("FAA").  Almost all parts available on the market are OEM parts.  PMAs cover mostly non-essential parts and are rarely available for the more important, and expensive, components of an APU, such as turbine blades.

Repair procedures are also critical to the repair and maintenance market, given the technical complexity of APUs.  Although Honeywell closely guards its proprietary repair methods involving OEM parts, the aviation industry as a whole has developed substitute repair methods for

Honeywell's APUs that both mimic and depart from Honeywell's protocols. These repair processes must be approved by a "designated engineering representative" ("DER") approved by the FAA, and are referred to within the industry as "DER repairs."

Apart from Honeywell, APU repairs are undertaken directly by the airlines ("self-servicing airlines"), Honeywell affiliates, and independent operators. Participants in this market typically bundle parts and repairs in an effort to woo the airlines into long-term repair and maintenance agreements.

The majority of Honeywell MRO servicers, known as Honeywell affiliates, operate under long-term contracts with Honeywell for parts. Under these agreements, a servicer typically agrees to certain obligations and royalty fees in exchange for discounts on Honeywell OEM parts, priority in allocation of parts in shortages, and a license to use Honeywell's intellectual property for APU repairs. At least five of the MRO servicers, including Aerotec, are independent companies without any manufacturer affiliation. These independent servicers typically obtain the necessary parts for repairs by submitting purchase orders for parts on an as-needed basis through spot contracts with Honeywell. Under Honeywell's tiered pricing structure, independent servicers pay more for OEM parts in spot orders than do self-servicing airlines, and typically pay more than Honeywell affiliates who negotiate prices as part of their long-term agreements. Facing these pricing differentials, independent servicers use cheaper PMA parts and DER repair methods when they are available, which is partly how they are able to compete in the volatile and competitive repair and maintenance market. Despite claimed barriers, Aerotec touts

that its prices are 20 percent lower than its competitors on average.

Although Aerotec traditionally controlled less than one percent of the Honeywell APU repair and maintenance market, beginning around 2006, after emerging from a second bankruptcy, Aerotec made a push to increase its market share and profitability. The company branded itself as a "fierce low cost" competitor to Honeywell. Aerotec wrangled major MRO deals away from Honeywell, including one with Saudi Arabian Airlines ("Saudia") in 2007 and another with Air India in 2009. The deal with Saudia was not easily won, and it was precarious from the get-go: Aerotec "openly discussed its financial limitations" with Saudia and contracted for a "'fixed monthly payment' plan . . . to ensure a steady cash flow," despite the fact that Saudia's prior deal with Honeywell had gone sour because of Saudia's late payments. Aerotec's sales director noted that carrying customer debt of $500,000 to $1,500,000 "would put [Aerotec] out of business." But for a time Aerotec's profits soared.

Aerotec's upward trajectory did not last. Beginning in 2007, a well-documented worldwide parts shortage for the Honeywell Model 331-500 APU used in Saudia's fleet of Boeing 777s hampered Honeywell's ability to follow through on commitments to purchasers of parts, including Aerotec. Because Honeywell's parts allocation system put independent MROs at the bottom of the priority list, Aerotec experienced delays in the delivery of parts. Aerotec's lack of a pre-existing inventory of parts exacerbated the problem. As a result of the unavailability of parts, Aerotec began having trouble fulfilling its contracts with Saudia and other clients. For its part, Saudia continued its pattern of late payments, leaving Aerotec stranded on a "continuous financial roller-

coaster" with millions of dollars of customer debt. Honeywell continued to sell parts to Aerotec, and, even when Aerotec could not financially cover its demand, extended credit lines. But the credit came at the cost of further de-prioritization of shipments and additional layers of review for parts orders. As a result of these difficulties, Aerotec suffered a series of major bidding losses: Saudia left Aerotec in 2009, opting instead for a Honeywell affiliate; Air India left for Honeywell; and Air China chose Honeywell in a hotly contested bidding process.

In the face of its dwindling market share, Aerotec turned to federal court and filed a complaint alleging causes of action under §§ 1 & 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, the Robinson-Patman Act, 15 U.S.C. § 13(a), and Arizona state law. Aerotec takes issue with Honeywell's claims that its hands were tied by a parts shortage. Instead, Aerotec views the parts shortage as a pretext—part of what Aerotec alleges to be Honeywell's thinly-veiled, multi-pronged plan to leverage its control over the parts market to pull business from independent servicers to itself and its affiliates.

In addition to the allegedly deliberate shipment delays, Aerotec alleges that Honeywell maintained an overly burdensome ordering process, held Aerotec to stringent payment terms at the same time that it failed to deliver parts, withheld needed technical information that previously had been provided as a matter of course, lured airline clients away from independent servicers by offering steeply discounted bundles of parts and repair services, and imposed a pricing penalty on independent servicers vis-a-vis airlines and Honeywell affiliates.

After the close of discovery, the parties filed cross-motions for summary judgment. The district court denied Aerotec's motion and granted Honeywell's motion, concluding that there was insufficient evidence to create triable factual disputes on Aerotec's federal antitrust claims. The court also dismissed Aerotec's Arizona state law claims because they either turned on the viability of Aerotec's federal antitrust claims or were unsupported by evidence sufficient to create a material factual dispute. Reviewing summary judgment de novo and viewing the evidence in the light most favorable to Aerotec, the non-moving party, we affirm. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995).

**ANALYSIS**

## I.  Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. Despite the breadth of the statutory language, the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189–90 (2010). Aerotec relies on two theories of liability under § 1: first, that Honeywell restrained trade by "tying" the purchase of Honeywell OEM parts to the purchase of Honeywell repair services; and second, that Honeywell restrained trade by

forcing airlines into de facto exclusive dealing arrangements with Honeywell and its affiliates.

## A.  Section 1 of the Sherman Act—Tying

In a tying arrangement, a "seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Cascade Health*, 515 F.3d at 912.  By so doing, a seller with "market power in one market . . . extend[s] its market power to an entirely distinct market."  *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).  To establish a tying claim, Aerotec must prove:

> (1) that [Honeywell] tied together the sale of two distinct products or services; (2) that [Honeywell] possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

*Cascade Health*, 515 F.3d at 913 (internal quotation marks omitted).   Aerotec's claim falters on the first, most fundamental requirement—the existence of a tie.

A tie only exists where "the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752b (3d ed. 2011).  Prohibited tying arrangements under § 1 include both positive and negative ties.  *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178

(1st Cir. 1994) (drawing parallels between "positive" and "negative" ties), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). Under the more traditional positive tie, sale of the desired ("tying") product is conditioned on purchase of another ("tied") product. *See id.* at 1156. A negative tie "occur[s] when the customer promises not to take the tied product from the defendant's competitor, but courts 'rarely encounter[]' such a situation." *See Cascade Health*, 515 F.3d at 912 n.23 (citing 10 Areeda & Herbert Hovenkamp, *supra* ¶ 1752c n.8 (2d ed. 2004)) (alteration in original). The common element in both situations is that a seller explicitly or implicitly imposes conditions linking the sale of a tying product with the sale of the tied product. *See* 10 Areeda & Hovenkamp, *supra* ¶ 1752e (3d ed. 2011) (noting that whether there is a tie turns on "whether the defendant gave buyers the reasonable impression that it would not sell product A to those who would not buy its B"). Aerotec's claim does not fit either framework because there is no condition linked to a sale. We decline to stretch the tying construct to accommodate the claim that Honeywell's conduct toward third party servicers—*i.e.*, parts delays, pricing decisions, and removal of technical data—acts as an effective, or "de facto," condition on sale to airlines.[1]

Although Aerotec urges that its theory is directly supported by the Supreme Court's decision in *Kodak*, Aerotec's claim is critically different from the "negative" tying claim in that case. *Eastman Kodak Co. v. Image*

---

[1] Aerotec's theory of tying is quite similar to the approach advanced and rejected in *Triad Sys. Corp. v. Se. Express Co.*, 1994 WL 446049 at *14–16 (N.D. Cal. Mar. 18, 1994), *affirmed in part and reversed in part on other grounds by* 64 F.3d 1330 (9th Cir. 1995).

*Technical Servs., Inc.*, 504 U.S. 451 (1992) ("*Kodak*"). In *Kodak*, the Supreme Court recognized a tie where Kodak conditioned the sale of printer replacement parts to copy machine owners on an agreement not to purchase repair services from an independent service provider: "[t]he record indicate[d] that Kodak would sell parts to third parties only if they agreed not to buy service from [independent service operators]." *Id.* at 463. Unlike in this case, Kodak imposed its tying conditions on the purchasers of parts. Conditions of sale to competitor service providers were not at issue. *Kodak* simply does not map onto the facts here, where the only claimed conditions imposed were on independent servicers.

Nor can Aerotec transform *Kodak* by waving its hands and saying that the gravamen of its complaint is a "de facto" or "implied" tie. We readily acknowledge that tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions. *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015) (recognizing "non-explicit tying" when a seller "adopts a policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the tied product"), *cert. denied*, 136 S. Ct. 498 (2015); *see also Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542–43 (9th Cir. 1983) (rejecting a claim of a "technological tie" but acknowledging the possibility of such a claim), *overruled on other grounds as recognized in Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997). The problem with Aerotec's claim is that there is no tie, *i.e.*, no evidence that Honeywell explicitly or implicitly ties or conditions the *sale* of APU parts *to APU owners* on a requirement that the owners "buy and repair Honeywell" and/or forego services from independent service providers. Aerotec does not dispute that Honeywell routinely

sells APU parts to airlines without conditioning sales on service contracts.  Honeywell allows airlines to purchase parts and services in separate transactions from whichever supplier they please.  This undermines the analogy to *Kodak*, even under an implied tying theory.  *See* Areeda & Hovenkamp, *supra* ¶ 1752a (Supp. 2016) (noting that the existence of a tie can only be established through a "nuanced inquiry into whether the defendant has so acted as to constrain buyer choices illegitimately").

Perhaps cognizant that the arrangement in *Kodak* does not fit the facts here because there is no direct condition linked to the sale of parts to airlines, Aerotec argues in the alternative that "Honeywell creates an implied tie by making the purchase of Honeywell's services an economic imperative." Honeywell achieves the tie, Aerotec alleges, by constraining the flow of parts to independent servicers via delays on orders, preferential pricing policies, and withholding of technical information needed to complete repairs—in other words, by squeezing third party service providers.  As a consequence, the independent servicers cannot deliver on airlines' reasonable expectations for finding a "one-stop shop" for all of their parts and repair needs.  Airlines "learn the game: if you want parts, you use Honeywell's repair services."  But Aerotec's chain of logic and evidence is too attenuated to support liability for tying under § 1.

Aerotec contends that a refusal to deal with competitors may form the basis of a tying claim.  Aerotec argues that *Cascade Health* supports its "refusal to deal" theory of tying. Importantly, however, that case did not dispense with the need for a tying condition embedded in a tying transaction. In *Cascade Health*, we said little about what constitutes a tie because it was obvious that there was a tying condition: the

plaintiff alleged, and provided evidence, that the defendant health care network conditioned insurers' purchase of tertiary care services on the purchase of primary and secondary services. 515 F.3d at 913. Only after briefly passing over the tying element did the court address the key issue, the coercion element. At issue was whether coercion was established by evidence that the defendant "forced insurers either as an implied condition of dealing or as a matter of economic imperative through its bundled discounting, to take its primary and secondary services if the insurers wanted tertiary services." *Id.* at 914.

Nothing in *Cascade Health* suggests that arguably manipulative tactics imposed on a third-party competitor are sufficient by themselves to create a tie with respect to a separate buyer simply because they make it less desirable to purchase from the third party. None of our cases postdating *Cascade Health* come close to recognizing such a theory, which echoes a plea for relief on behalf of a competitor, not for the sake of competition itself. *See e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) (involving conditions imposed on the *buyer* of the tying product); *Blough v. Holland Realty, Inc.*, 574 F.3d 1084 (9th Cir. 2009) (same); *Rick-Mik Enterprises, Inc. v. Equilon Enterprises, LLC*, 532 F.3d 963 (9th Cir. 2008) (same).

Ultimately, Aerotec's arguments fall off the rails for lack of any evidence that airlines were presented with an offer for the sale of parts that could have been reasonably perceived as conditioned on refraining from the purchase of parts or services from any other service provider besides Honeywell. The claim that Honeywell clogs and complicates the parts distribution pipeline to independent servicers cannot

substitute for the necessary evidence of an implied condition embedded in the sale of the tying product.

## B.  Section 1 of the Sherman Act—Exclusive Dealing

Aerotec brings a second claim under § 1 of the Sherman Act, alleging that Honeywell engaged in exclusive dealing, which is an "agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor," and forecloses competition. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 & n.1 (9th Cir. 2010).[2]  The agreements for purchase of repair services from Honeywell by the airlines are the starting point for our analysis.   The record of these contracts, however, is characterized more by what is missing than what is there.  Aerotec cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement.  Nor is there evidence that Honeywell has a global agreement with all of its customers such that Aerotec's failure to pinpoint or analyze specific agreements can be excused.  The devil is in the details.  We affirm the district court's award of summary judgment on this claim because an exclusive dealing claim cannot succeed without evidence of exclusive dealing.

Aerotec has the burden to show that the agreements at issue foreclosed competition. *See id.* at 996 n.1 ("[I]n a case under Section 1 of the Sherman Act, the plaintiff must prove

---

[2] Because exclusive dealing arrangements provide "well-recognized economic benefits . . . including the enhancement of interbrand competition," we apply the rule of reason rather than a per se analysis. *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).

that the exclusive dealing arrangement actually foreclosed competition."). In analyzing foreclosure, we

> weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). This inquiry requires that we look at the actual terms of the agreements; indeed, "a prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012); *see also Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 n.24 (3d Cir. 1992) (acknowledging that the first question is whether there is an agreement to exclusivity). In doing so, we typically focus on whether there are requirements terms (*i.e.*, terms requiring a buyer to purchase all the product or service it needs from one seller), *see Tampa Elec. Co.*, 365 U.S. at 322, volume or market share targets, *see ZF Meritor*, 696 F.3d at 283, or long-term contracts that prevent meaningful competition by taking potential purchasers off the market, *see Omega Envtl.*, 127 F.3d at 1163–64 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."). *See generally* Areeda & Hovenkamp, *supra* ¶ 1800a1-3.

Aerotec failed to provide any significant details about the repair agreements between Honeywell and the airlines. The only evidence of substance is a declaration from Aerotec that, pursuant to industry practice, purchasers of repair services contract for 3–7 years at a time, as well as testimony that Honeywell gives airline customers a 15 percent discount on parts. There is no evidence of which customers or how many of the contracts were for 3–7 years; likewise, there is no evidence that the discount is an "extreme quantity discount" that "give[s] a customer a lower price for buying in larger absolute quantities or a larger proportion of its needs," amounting to "de facto" exclusive dealing. Areeda & Hovenkamp, *supra* ¶ 1807b2. Nor is there evidence of other terms that in effect transform these unspecified transactions into exclusive arrangements.

Aerotec does point to a market analysis that shows that as much as 47 percent of Honeywell APUs are under *some form* of contract for repair with Honeywell, but this figure conveys no relevant information about the substance of the contracts. What are the details? What is the term of the contract? Is it a spot market contract or a long-term contract? What restrictions or conditions are imposed on the customer? We don't know because Aerotec didn't tell us, either through copies of the contracts, analysis of the contract terms, or expert testimony. It is undisputed that *some* proportion of Honeywell's repair contracts are non-exclusive and temporally circumscribed, as Honeywell provides single, on-demand repair services on a "time and materials" basis.

Contracts, *simpliciter*, are not illegal under the Sherman Act. Indeed, none of the indicia that we would ordinarily review in an exclusive dealing claim—*e.g.*, requirements terms, steep market-share requirements, contract duration and

other terms—are present in this record. The record simply does not indicate what proportion of the market is bound up in long-term contracts at any particular point in time or to what effect. At this stage of the litigation, after extensive discovery, Aerotec needed to do something more than offer conclusory statements and stitch together disparate facts about the market for repairs; it needed concrete documentation that Honeywell's agreements prevented customers from giving their repair business to other MRO servicers. The speculation and innuendo offered by Aerotec cannot substitute for evidence.

Aerotec attempts to redirect attention from the absence of evidence of the exclusive substance of the agreements by focusing on Honeywell's power to force airlines to accept Honeywell services to the detriment of independent servicers. Evidence of Honeywell's power to induce purchases of repairs by airlines is certainly relevant under a "de facto" exclusive dealing theory where we look "past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world." *ZF Meritor*, 696 F.3d at 270 (internal quotations omitted); *see also LePage's Inc. v. 3M*, 324 F.3d 141,157 (3d Cir. 2003) (en banc) (same); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005) (same). In certain limited situations, discounts and rebates conditioned on a promise of exclusivity or on purchase of a specified quantity or market share of the seller's goods or services may be understood as "de facto" exclusive dealing contracts because they coerce buyers into purchasing a substantial amount of their needs from the seller. Areeda & Hovenkamp, *supra* ¶ 1807b1-2.

Although we have not explicitly recognized a "de facto" exclusive dealing theory like that recognized in the Third

Circuit and Eleventh Circuit, *see ZF Meritor*, 696 F.3d at 282 n.14 (reasoning that an "exclusive dealing claim does not require a contract that imposes an express exclusivity obligation"); *McWane, Inc. v. FTC*, 783 F.3d 814, 833–35 (11th Cir. 2015) (rejecting "formalistic distinctions" between exclusive dealing contracts and exclusive programs), we need not reach the issue here because, at bottom, a plaintiff must still show that contracts that were induced were exclusive rather than run-of-the-mill contracts, which inevitably "'foreclose[]' or 'exclude[]' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983). Simply put, a 15 percent discount on a single sale (or a series of independent sales) may be enticing enough to "coerce" a purchase in that instance, but in the absence of any exclusive requirements on which the discount is conditioned, the sale remains non-exclusive. The "de facto" exclusive dealing theory does not provide Aerotec an end run around the obligation to first show that express or implied contractual terms in fact substantially foreclosed dealing with a competitor for the same good or service.

A close review of the Third Circuit's approach also underscores that the "de facto" exclusive dealing theory is of no use to Aerotec. In *ZF Meritor*, for instance, the question was whether long-term agreements that "did not expressly require the [purchasers] to meet . . . market penetration targets . . . were as effective as mandatory purchase requirements." 696 F.3d at 282. The court concluded they were because no buyer could "afford to lose" the seller's business, and thus the conditional discounts and unilateral cancellation provision effectively coerced buyers to enter into contracts with onerous terms, such as five-year commitments.

*Id.* at 283.  Just as in any exclusive dealing claim, however, the court first had to be satisfied that specific features of the agreement required exclusivity.  Accordingly, the court examined the terms of the agreements in detail, focusing on their duration, the high market-share targets (at least 80 percent and up to 97.5 percent), and other specific terms granting preferential treatment to the seller in subsequent sales.  *Id.* at 286–88.  The same was true in *LePage's*, where the Third Circuit recognized that extensive "all-or-nothing" discounts and rebates were not express exclusivity terms, but still looked to evidence that buyers understood offers as conditional on the buyer foregoing purchases from competitor manufacturers of tape, 324 F.3d at 158–59, and in *Dentsply*, where the court recognized that a condition of only carrying the seller's product imposed in a "series of independent sales" was sufficient to make the exclusive condition as effective as if it was articulated in a written contract, 399 F.3d at 193.  Unlike in those cases, the record here is missing evidence of contracts, the claimed extra-contractual conditions, or preferential treatment terms.

## II.  Section 2 of the Sherman Act

Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  For liability to attach, a defendant must (1) possess monopoly power and (2) use that power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor."  *Kodak*, 504 U.S. at 482–83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).  In considering Aerotec's claims, we assume without deciding that Honeywell possesses monopoly power in the market for APU parts.

Aerotec asserts what it describes as "a refusal-to-deal/essential-facilities theory," claiming that refusal is proved via intent to foreclose competition or through Honeywell's control of parts, an essential input. This novel framing of Aerotec's § 2 claim is an effort to sidestep the reality that there was no actual refusal to deal. Instead, Aerotec attacks Honeywell's business terms as a "de facto" refusal that is revealed by Honeywell's intent to squash independent firms. Aerotec's premise runs afoul of long-standing precedent that "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("*Trinko*") (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). As we noted in *MetroNet Services*, the Supreme Court has exercised considerable caution in recognizing exceptions to this broad principle for three core reasons: 1) compelled sharing of the resources generating a competitive advantage undermines the purpose of antitrust law by reducing incentives to invest in those resources; 2) compelled sharing puts federal courts in the role of central planners despite their being ill-equipped to assume this role; and 3) the compelled sharing may actually provide opportunities for collusion, which is the "'supreme evil of antitrust.'" *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (quoting *Trinko*, 540 U.S. at 407–08).

## A.  Section 2 of the Sherman Act—Refusal to Deal

In light of the Supreme Court's reluctance to impose a duty to deal—*Trinko* declared the Sherman Act as "the

Magna Carta of free enterprise," 540 U.S. at 415 (internal quotations omitted)—Aerotec attempts to shoehorn Honeywell's alleged conduct (*i.e.*, "withholding of parts and technical data, onerous payment terms, and pricing penalties") into the narrow exception recognized in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In *Aspen Skiing*, the defendant—who owned three of the four ski resorts in the market—discontinued a joint lift-ticket package with a smaller rival, the only other competitor in the market, and then flatly refused to sell the rival any lift tickets so it could create its own bundles. 472 U.S. at 592–94. It is no wonder that the Supreme Court characterized this "limited exception" as "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

*Aspen Skiing* offers no relief here. Aerotec simply did not like the business terms offered by Honeywell, especially after things began to change in 2007. But this "business pattern" can hardly be characterized as so onerous as to be tantamount to the conduct in *Aspen Skiing*. Aerotec's vague requested remedy that we "order Honeywell to provide parts, data, and prices like it did before 2007," reveals the problems with Aerotec's refusal to deal claim: providing any meaningful guidance to Honeywell and ordering it to artificially create pre-2007 market conditions would require the courts to play precisely the kind of "central plann[ing]" role that courts are "ill suited" to play. *Id.* at 408. As the Supreme Court has repeatedly emphasized, there is "no duty to deal under the terms and conditions preferred by [a competitor's] rivals," *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009); there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is "to sacrifice short-term benefits in order to obtain higher profits

in the long run from the exclusion of competition," *MetroNet Servs.*, 383 F.3d at 1132.

Sensing the deficiencies in its theory, Aerotec argues that intent to foreclose competition is sufficient to establish § 2 liability. While it is true that intent is a necessary element of attempted monopolization, it is not sufficient alone to establish liability. Competitors are not required to engage in a lovefest; indeed, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). As the Tenth Circuit noted in rejecting a claim similar to the one here, "[w]ere intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013). By its very terms, § 2 of the Sherman Act regulates anti-competitive conduct, not merely anti-competitive aspirations or an independent decision on terms of dealing with a competitor.

## B. Section 2 of the Sherman Act—Essential Facilities

The essential facilities doctrine is one of the circumstances in which plain English and antitrust lingo converge. This theory is a variation on a refusal to deal claim. It imposes liability where competitors are denied access to an input that is deemed essential, or critical, to competition. *See Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988). Although the Supreme Court has never recognized the doctrine, *see Trinko*, 540 U.S. at 411, we have continued to treat it as having a basis in § 2 of the Sherman Act. *See MetroNet*

*Servs.*, 383 F.3d at 1129; *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 (9th Cir. 1991).

To establish a violation of the essential facilities doctrine, Aerotec must show (1) that Honeywell is a monopolist in control of an essential facility, (2) that Aerotec, as Honeywell's competitor, is unable reasonably or practically to duplicate the facility, (3) that Honeywell has refused to provide Aerotec access to the facility, and (4) that it is feasible for Honeywell to provide such access. *MetroNet Servs.*, 383 F.3d at 1128–29. Because mandating access, as the essential facilities doctrine implies, shares the same concerns as mandating dealing with a competitor, a facility is essential "only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines*, 948 F.2d at 544.

Aerotec reasons that APU parts are the "essential facility" because, absent parts, "repairs are impossible." According to Aerotec, Honeywell uses a variety of tactics to put pressure on the parts supply chain. As a "smoking gun," Aerotec emphasizes an internal Honeywell presentation outlining its efforts to manage a complex, crowded, competitive environment by controlling intellectual property, creating barriers to entry, and managing the supply chain by limiting parts availability.

Aerotec's claims fail for an obvious reason—a facility is only "essential" where it is otherwise unavailable. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1380 (9th Cir. 1992). In addition to substantial purchases of parts from Honeywell, Aerotec has access to both PMA parts and OEM aftermarket parts acquired from other servicers. For example, in 2007 alone, Aerotec purchased $1,074,072 of PMA parts

and $9,347,661 of APU parts from vendors other than Honeywell (compared with about $9,420,240 in parts from Honeywell). Although Honeywell's ordering process may very well be "Kafkaesque," as Aerotec believes, and Honeywell may even provide priority access to certain customers, Honeywell does not deny Aerotec access to APUs or their component parts. *Trinko* teaches that "where access exists, the [essential facilities] doctrine serves no purpose." 540 U.S. at 411.

In sum, there is no evidence that Aerotec is frozen out of—or even faces a chill in accessing—the parts supply chain. Thus, "[b]ecause reasonable access to the essential facility exists—even if not in a way that is conducive to [Aerotec]'s existing business model—[Aerotec] cannot establish an essential facilities claim." *MetroNet Servs.*, 383 F.3d at 1130.

## C.  Section 2 of the Sherman Act—Bundled Discounts

Both Honeywell and Aerotec offer bundled parts and repairs. As we explained in *Cascade Health*, "[b]undling is the practice of offering, for a single price, two or more goods or services that could be sold separately." 515 F.3d at 894. Such bundling practices "generally benefit buyers because the discounts allow the buyer to get more for less," and they also often "result in savings to the seller because it usually costs a firm less to sell multiple products to one customer at the same time than it does to sell the products individually." *Id.* at 895 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) (per curiam)).

Because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above

predatory levels," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990), the Supreme Court has cautioned against recognizing antitrust discounting claims except where the "prices complained of are below an appropriate measure of [a] rival's costs" and where there is a "dangerous probability" that the pricing firm will be able to "recoup[] its investment" after it has successfully extinguished its competitors through artificially low prices. *Brooke Grp.*, 509 U.S. at 222–24. As the Court has observed,

> [T]he costs of erroneous findings of predatory-pricing liability [are] quite high because the mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition, and, therefore, mistaken findings of liability would chill the very conduct the antitrust laws are designed to protect.

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007) (internal citations omitted).

Like the negative tinge sometimes associated with bundled campaign contributions, Aerotec endeavors to cast Honeywell's bundling behavior in a negative light. Despite the common practice of bundling parts and repairs—routine practice for both Honeywell and Aerotec—Aerotec claims that because Honeywell controls the pricing in the parts market, independent shops cannot compete with Honeywell's steep discounts on the bundles. In truth, Honeywell's discounts mirror the "lower cost structure" of Honeywell's vertical integration, and therefore reflect "competition on the merits." *Brooke Grp.*, 509 U.S. at 223.

Aerotec offers no credible evidence that Honeywell prices repair services below cost. The transaction that Aerotec claims led to below cost pricing on repairs was a Honeywell repair bid to Avianca Airlines, which reflected a substantial discount. Notably, the record does not include Honeywell's actual costs of labor and parts for this deal; Aerotec infers that the prices must be below cost, whatever the costs might be. Honeywell counters that the Avianca bid is not comparable to a below-cost bid because it is part of a "Not-to-Exceed" ("NTE") agreement with the customer, wherein Honeywell agreed to provide repair services and parts for a price not to exceed a certain amount. Honeywell notes that, as long as it makes a profit over the course of repeated repair jobs with any one airline, it is pricing above cost. Honeywell provided substantial evidence of its "Airline Sales Approval Process," through which it analyzes its NTE agreements and ensures that it sets its bids in the aggregate above cost. Honeywell also offered extensive evidence regarding its positive revenues on the specific contracts Aerotec challenges. In short, Aerotec's single example, isolated and out of context, is insufficient to support a predatory pricing claim.

Aerotec suggests that it does not matter what Honeywell's costs were because the discount on the Avianca bid was so extreme that, *if Aerotec priced repairs at cost*, it would have to offer repairs for less than $0 to compete with Honeywell's bundled bid. Aerotec relies on the discount attribution test from *Cascade Health*, under which "the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products" and the "resulting price of the competitive product or products" is compared to the "defendant's incremental cost to produce them." 515 F.3d at 906. But the math doesn't add up here because

the discount attribution test does not apply in circumstances like this where the parties offer the same bundle of goods and services.

As *Cascade Health* made clear, the discount attribution test only applies where one of the competitors produces fewer goods or services than the other competitor. *See id.* at 909 ("[T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival who is equally efficient at producing the competitive product *simply because the rival does not sell as many products as the bundled discounter*." (emphasis added)). It is the fact that the bundling competitor has exclusive capacity to "bundle" multiple products and absorb the cost of the total discount without experiencing a decline in profits that gives rise to the possibility that it could force out a "*hypothetical* equally efficient producer of the competitive product." *Id.* at 906; *see also* Areeda & Hovenkamp, *supra* ¶ 749a.

Here, Aerotec provides airlines with the same bundle that Honeywell provides: parts and services. Honeywell's ability to offer discounts on its parts when they are bundled with repair services is not categorically unavailable to Aerotec. Aerotec need not sell the parts in its bundled packages for cost if it is able to provide repair services more efficiently than Honeywell. Indeed, Aerotec provided evidence that it can and does outbid Honeywell, despite the fact that it must acquire parts first. Aerotec claims that it "provides high quality cost-effective repairs": for instance, its "repairs last up to 24% longer than competitors', and its prices are 20% lower." Aerotec's effort to invoke the discount attribution framework yields an absurd result, and one that risks applying our bundled discount jurisprudence to conduct far afield from conduct "resembl[ing] the behavior that the Supreme Court

in *Brooke Group* identified as predatory." *Cascade Health*, 515 F.3d at 903.

Without any evidence of below-cost pricing or anti-competitive bundled discounting, Aerotec is left with only an argument that Honeywell engages in unlawful conduct by simultaneously charging a low (but above-cost) price for its repair bundles and raising the wholesale price of replacement parts to make it difficult or impossible for competitor servicers to offer similarly low-priced repair bundles. Although it disclaims making a "price squeeze claim," this argument is foreclosed by the Supreme Court's decision in *linkLine*. In *linkLine*, the Supreme Court rejected a "price-squeeze" claim under which independent internet service providers who purchased inputs from AT&T but also competed against it in the retail outlet for certain digital services alleged that AT&T used its market power in the "upstream," or wholesale, market to "squeeze its [retail] competitors by raising the wholesale price of inputs while cutting its own retail prices." 555 U.S. at 449. The Court held that "no such claim may be brought." *Id.* at 442. As we noted in applying *linkLine*, the case stands for the principle that "there is no independently cognizable harm to competition when the wholesale price and the retail price are independently lawful." *Doe 1 v. Abbott Labs.*, 571 F.3d 930, 934–35 (9th Cir. 2009). Such is the case here.

## III.    Robinson-Patman Act—Price Discrimination

Aerotec alleges that Honeywell engages in secondary-line price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13(a), by giving Honeywell affiliates greater discounts off catalog price for parts than it provides to Aerotec and its fellow independent servicers. Secondary-line

price discrimination, which means a seller gives one purchaser a more favorable price than another, requires (1) sales in interstate commerce; (2) products of the same grade and quality; (3) discrimination in price between two buyers; and (4) injury. *See Volvo Trucks N.A., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176–77 (2006). Aerotec's claims fail on the third element because the only pricing discrepancy between independent servicers and Honeywell's affiliates documented in any way in the record is attributable to the benefits received by Honeywell (and its affiliates) through long-term agreements.[3]

We start by noting considerable confusion in the briefing regarding the basis of the price discrimination claim. Aerotec claims that Honeywell charges independent servicers an across-the-board 15 percent premium which it does not impose on affiliates. Not so. All repair servicers, affiliates or not, are charged the 15 percent premium. In fact, the 15 percent premium is simply a lesser discount: airlines receive a 50 percent discount off list price, and all

---

[3] Although Honeywell claims that the "in commerce" requirement is not met because a number of the sales are to foreign airlines or service centers, it misapprehends the scope of this clause. For starters, a significant number of Honeywell's APU sales are to customers for use or resale in the United States, although the parties have made no effort to fine tune the documentation or segregate the sales. Because this claim fails on other grounds, we need not parse the details of whether sales to international airlines could, in some cases, qualify as sales "for use, consumption, or resale" within the United States. 15 U.S.C. § 13(a). *Compare Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986) ("The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce.") *with Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 878 (9th Cir. 1982) (holding that the "flow of commerce ends when goods reach their intended destination" (internal quotations omitted)).

servicers—whether affiliated or not—receive a 42.5 percent discount. The difference between the two discounts is the source of the 15 percent figure. Honeywell's tiered pricing structure therefore cannot serve as the basis of a price-discrimination claim, at least insofar as Aerotec alleges that Honeywell affiliates are the favored party.

Aerotec presents another argument for price discrimination between Honeywell affiliates and independent servicers—that the long-term contracts Honeywell negotiates with affiliates contain variable discounts off the price that independent servicers receive on the spot market. This argument fails because the contracts are not comparable. Unlawful secondary-line price discrimination exists only to the extent that the differentially priced product or commodity is sold in a "reasonably comparable" transaction. *Tex. Gulf Sulphur Co. v. J.R. Simplot Co.*, 418 F.2d 793, 807 (9th Cir. 1969). Quite sensibly, courts have held that "a seller is not obligated to charge the same prices for a commodity if its sales contracts with different buyers contain materially different terms," as they do when a seller and purchaser choose the relative stability of a long-term contract over individual transactions in a "spot market." *Coal. For a Level Playing Field, LLC v. AutoZone, Inc.*, 737 F. Supp. 2d 194, 212 (S.D.N.Y. 2010) (citing *Coastal Fuels of P.R., Inc. v. Caribbean Petrol. Corp.*, 990 F.2d 25, 27 (1st Cir. 1993)).

Aerotec is mistaken in its premise that any transactional differences are not reflective of materially different terms. For example, servicers under an affiliate contract are subject to substantial obligations that are not imposed on independent repair shops like Aerotec. These may include payment of license/royalty fees, maintenance of insurance, exclusive use of Honeywell parts, and compliance with policies,

regulations, and procedures promulgated by Honeywell. Aerotec provided no examples of any spot sales between independent servicers and Honeywell that could be fairly compared to the terms and prices that were individually negotiated in agreements between Honeywell and its affiliates. As such, its claims for price discrimination fail.

## IV.    State Law Claims

Although Aerotec brought several claims under Arizona state law, it acknowledged at oral argument that success on the state antitrust claims rises and falls with the outcome of the federal claims. Likewise, Aerotec has been candid that its tortious interference claims live or die based on its federal antitrust claims. Because we affirm the district court's award of summary judgment in favor of Honeywell on all of Aerotec's federal antitrust claims, we likewise affirm the court's award of summary judgment on the Arizona antitrust claims and dismissal of the tort claims.

### CONCLUSION

There is no real dispute that Aerotec was a competitor to Honeywell, albeit a small one, in the APU repair market. But the antitrust laws require injury to competition, not merely injury to a competitor. Aerotec's claims fail both as a matter of law and because it failed to marshal evidence of genuine issues of material fact on its tying, exclusive dealing, refusal to deal, bundled discount, and pricing discrimination claims.

**AFFIRMED.**