NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**POWER ANALYTICS CORPORATION,**
*Plaintiff-Appellant*

**v.**

**OPERATION TECHNOLOGY, INC., DBA ETAP, OSISOFT, LLC, SCHNEIDER ELECTRIC USA, INC.,**
*Defendants-Appellees*

---

2019-1805

---

Appeal from the United States District Court for the Central District of California in No. 8:16-cv-01955-JAK-FFM, Judge John A. Kronstadt.

---

Decided: July 13, 2020

---

ROBERT F. RUYAK, RuyakCherian LLP, Washington, DC, argued for plaintiff-appellant. Also represented by RICHARD RIPLEY, BRITTANY VACEK RUYAK.

TREVOR V. STOCKINGER, Kesselman Brantly Stockinger LLP, Manhattan Beach, CA, argued for all defendants-appellees. Defendant-appellee Operation Technology, Inc. also represented by SALUMEH R. LOESCH, JOHN D. VANDENBERG, Klarquist Sparkman, LLP, Portland, OR.

MICHAEL JOHN SACKSTEDER, Fenwick & West, LLP, San Francisco, CA, for defendant-appellee OsIsoft, LLC. Also represented by GEOFFREY ROBERT MILLER, New York, NY; JOSEPH STEPHEN BELICHICK, Mountain View, CA.

REGINALD J. HILL, Jenner & Block LLP, Chicago, IL, for defendant-appellee Schneider Electric USA, Inc. Also represented by BENJAMIN J. BRADFORD, SHAUN VAN HORN; ADAM G. UNIKOWSKY, Washington, DC.

———————————

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Concurring opinion filed by *Circuit Judge* MOORE.

O'MALLEY, *Circuit Judge.*

As courts have regularly maintained, the allegations set forth in a complaint may not simply recite the elements of a cause of action. A plausible "short and plain" statement of the plaintiff's claim, pursuant to Federal Rule of Civil Procedure 8(a)(2), must contain putative facts that provide fair notice and show that the plaintiff is entitled to relief. *Skinner v. Switzer*, 562 U.S. 521 (2011). Although we accept such factual allegations as true at the motion to dismiss stage, the complainant "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

The "practical significance" of Rule 8 rings especially true in antitrust cases. *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 557–58 (2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). In such cases, district courts properly insist on some specificity to relieve parties of "the potentially enormous expense of discovery in cases

with no reasonably founded hope that the discovery process will reveal relevant evidence to support a [Sherman Act] claim." *Id.* at 559–60 (internal citations omitted). That is what the district court did in this case.

With the patience of a first grader's piano teacher, the district court detailed the requirements of Sherman Act §§ 1 and 2 violations, explained why the allegations failed to establish anticompetitive conduct, and dismissed Power Analytics' multiple amended complaints *without prejudice*, providing the plaintiff with an opportunity to shore up such deficiencies. Despite the advantage of developed discovery and *three* bites at the Rule 8 apple, Power Analytics never provided a plausible statement of relief. Instead, it announced during the last motion to dismiss hearing that the district court had misconstrued its § 1 claim as alleging "exclusive dealing arrangements" as opposed to concerted "refusals to deal," and demanded a favorable outcome on this new basis. *Power Analytics Corp. v. Operation Tech., Inc., et al.*, Case No. 16-01955, 2018 WL 10231437, at *1 n.1 (C.D. Cal. July 24, 2018). Declining to address the new, unbriefed theory, the district court dismissed the complaint as deficient, once again *without prejudice*, allowing Power Analytics to advance its new theory with proper briefing. Rather than accept the district court's generous offer to amend its complaint for a *fourth* time, Power Analytics took this appeal, and now maintains that the district court's entire analysis under § 1 is "irrelevant" here. It asks that we do what it did not give the district court an opportunity to do: evaluate its § 1 claim under a refusal to deal theory. We will not do that.

Because we find that Power Analytics has waived its § 1 argument and agree with the district court's conclusions regarding § 2 and the attendant state law claims, we conclude that Power Analytics' third amended complaint fails to state a claim for which relief may be granted. We *affirm*.

## I. BACKGROUND

### A. Grid Design and Management Products and Services

Appellant Power Analytics and Appellees ETAP, OSISoft LLC ("OSI"), and Schneider Electric USA, Inc. ("Schneider") (collectively, "Appellees") are all in the business of developing and selling software products for use with power grids or microgrids. *Power Analytics Corp.*, 2018 WL 10231437, at *1.

Grid Design and Management Products and Services ("Grid D and M Products) help operators design and manage power grids and microgrids that operate in facilities ranging from nuclear power plants to data centers. J.A. 1403 ¶ 18. There are a variety of different products and services within the Grid D and M Products category, but as relevant to this appeal, the parties develop and sell: (1) Grid Design Products and Services ("Grid Design products"); (2) Real Time products; and (3) Historian Software products.

Grid Design products are software programs used in the engineering, design, and subsequent management of power grids and microgrids. J.A. 1403 ¶ 22. Some of these products are audited and certified for use in nuclear facilities, as required by federal law and regulation. J.A. 1404 ¶ 25. Both Power Analytics and ETAP sell Grid Design products. *Id.*

Once a power grid or microgrid is designed, installed, and deployed, the operator can use software products that provide additional functionality. These include "Real Time" products, which "analyz[e] trends and predict[] potentially damaging events." J.A. 1405 ¶ 27. Real Time products can improve the current and future operation of a Power Grid or Microgrid by "collecting and utilizing current data in near real time to inform such functionality." J.A. 1492 ¶ 27. Power Analytics makes and sells a Real Time product that can track Power Grid operations on a

continuous basis. J.A. 1405–06 ¶¶ 29–31. When paired with Power Analytics' Grid Design products, its Real Time product achieves "full functionality." J.A. 1428 ¶ 114. Power Analytics alleges that ETAP and Schneider sell Real Time products that compete with Power Analytics' own product. J.A. 1406 ¶ 32.

Nuclear power generation facilities require software products known as "Historian Software." J.A. 1406 ¶ 33. Historian Software products allow these facilities to systematically collect and retain time series information related to the operation of their power grid systems, record this information, and report certain prescribed incidents of system operation to other facilities. *Id.* Grid Design and Real Time products, if audited and implemented in nuclear facilities, must interact with Historian Software. J.A. 1406 ¶ 34. Appellant and Appellees all offer Historian Software products. J.A. 1406–07 ¶ 35–38.

These three types of products—Grid Design, Real Time, and Historian—can be sold in "bundles" as a complete platform, utilized to operate a facility's entire microgrid. *Power Analytics*, 2018 WL 10231437, at *3.

### B. The Alleged Antitrust Markets

Power Analytics' Third Amended Complaint ("TAC") alleges that there are three relevant product markets: (1) the Nuclear Procurement Issues Committee ("NUPIC") Grid Design Market; (2) the NUPIC Real Time Market; and (3) the Energy Management Systems ("EMS") Platform Market. We describe each of these below.

NUPIC is an "industry partnership among nuclear power plants licensed by the Nuclear Regulatory Commission." *Power Analytics*, 2018 WL 10231437, at *4 (quoting J.A. 1501 ¶ 63). All North American nuclear facilities are NUPIC members. *Id.* (citing J.A. 1501 ¶ 63). Software products used in nuclear facilities must attain NUPIC

certification through an audit by at least five separate NUPIC members. *Id.*

The TAC defines the NUPIC Grid Design Market as the North American market for "the sale and servicing of Grid Design Products to customers who, by law and or regulation, may only purchase and deploy Grid Design Products that have been 'certified' by successfully completing a NUPIC audit within the prior three years." J.A. 1500 ¶ 60. The TAC defines the NUPIC Real Time Market as the North American market for "the sale and servicing of Real Time Products to customers who by law and or regulation, may only purchase and deploy Real Time Products that have been 'certified' by successfully completing a NUPIC audit within the past three years." *Power Analytics*, 2018 WL 10231437, at \*5 (citing J.A. 1500 ¶ 61). According to the TAC, the NUPIC Markets are comprised "almost entirely of nuclear power generation facilities, a small number of other facilities that use or employ nuclear power, and entities who provide design and other services to such nuclear power facilities." *Id.* (quoting J.A. 1500–01 ¶ 62). The TAC alleges that NUPIC's exhaustive certification process makes products and services sold in the NUPIC Markets "economically and functionally distinct" from markets that sell non-NUPIC certified versions of these products, such as the EMS Platform Market. *Id.* (quoting J.A. 1501 ¶ 64); J.A. 1413–14 ¶ 64.

EMS Platforms are "the full bundle of automation, monitoring and control software, hardware and related equipment purchased by facility owner/operators for use as an 'EMS Platform.'" J.A. 1435 ¶ 136. They consist of a bundle of numerous components, including Grid Design and Real Time products. *Power Analytics*, 2018 WL 10231437, at \*5. The TAC defines the EMS Platform Market as the North American market dedicated to the sale and servicing of EMS platforms. J.A. 1519 ¶ 119.

### C. Appellees' Putative Anticompetitive Behavior

In 2013, Power Analytics released a new Real Time product. J.A. 1507 ¶ 84. A press release announced that this product provided "the ability to see the 'as designed' system and compare it against the real time power system as it is operating." J.A. 1507 ¶ 84. The product was advertised to host a variety of new features, such as the ability to "run what-if scenarios, generate reports, [and] view real time usage and diagnostic data." J.A. 1507–08 ¶ 84.

After ETAP learned of the press release, its senior management circulated an internal memorandum, which recited:

> Great!!!!!
>
> All of our USP [Unique Sales Propositions] will be now [sic] for EDSA[1]. We need to kill such competition from these companies. (EDSA, Cyme, DigSilent, PSSE in particular).

J.A. 1508 ¶ 85. Power Analytics contends this was a declaration of intent to "kill competition" from Power Analytics. Appellant Br. 8.

The TAC alleges that ETAP then embarked on a competition-killing strategy intended to insulate its Grid Design business from Power Analytics' superior offerings. J.A. 1507–09 ¶¶ 84–90. According to the TAC, this resulted in two anticompetitive agreements: one with OSI and one with Schneider.

### 1. The OSI-ETAP Agreement

In September 2014, ETAP and OSI announced that they had entered into a "strategic partnership." J.A. 1508 ¶ 86. As alleged in the complaint, the two companies

---

[1] During this time, Appellant Power Analytics was known as "EDSA Micro Corporation." J.A. 1453 ¶ 191.

agreed to bundle their products—ETAP's Grid Design software and OSI's Historian Software. The TAC characterizes this as an attempt to "exclude existing and potential competitors from providing products which challenge each of their dominant monopoly positions in the market." *Power Analytics*, 2018 WL 10231437, at *7 (citing J.A. 1506 ¶ 79). The resulting agreement ("the OSI-ETAP Agreement") allegedly placed "'unreasonable impediments and conditions intended to preclude and/or deter' existing customers from switching out OSI and ETAP's products with those of [Power Analytics'] and certain other 'actual and potential competitors.'" *Power Analytics*, 2018 WL 10231437, at *7 (citing J.A. 1509 ¶ 91).

The TAC refers to a 2013 Term Sheet documenting key provisions of the agreement. *Id.* The document allegedly states that customers who purchase OSI products under the OSI-ETAP Agreement may only use those products in conjunction with ETAP products. *Id.* The TAC also states that ETAP and OSI produced a Memorandum of Understanding ("MOU") to commemorate this "exclusivity mechanism": both companies are allegedly required to recommend each other's products to prospective customers. *Power Analytics*, 2018 WL 10231437, at *7 (citing J.A. 1510–11 ¶¶ 94–95).

2. The Schneider-ETAP Agreement

In 2012, ETAP and Schneider began to jointly sell Schneider's Historian Software with ETAP's Grid Design software. J.A. 1456 ¶¶ 198–99. A year later, around the time of ETAP's internal memorandum, ETAP allegedly met with Schneider with the intention of "expand[ing] [their] initial arrangement." J.A. 1457 ¶ 202. The TAC contends that Schneider and ETAP agreed to an exclusive and sole-sourced arrangement (the "Schneider-ETAP Agreement"). J.A. 1457 ¶ 204. In support of this allegation, the TAC cites to a press release that Schneider issued in 2015, where the company announced it had

"standardized" the use of ETAP software for its electrical engineering design, analysis, and operation services. J.A. 1458 ¶ 204. The press release, entitled "Schneider Electric Standardizes on ETAP Across its Services Division," recites in relevant part:

> Schneider Electric, a global leader in energy management and engineering solutions has chosen ETAP Power System Enterprise Solution as its strategic platform for its engineering services business . . . Schneider Electric decided to standardize the use of ETAP for its projects in order to leverage the advanced, next-generation technology of the integrated ETAP software suite to further increase its productivity through greater efficiencies. ETAP provides Schneider Electric higher design reliability and quality, rule-based analysis, and automation capabilities that will help to optimize and fast track project engineering design and analysis processes.

*Id.* The TAC alleges that this use of "standardized" indicates that all Schneider EMS Platform Products will *only* include ETAP Grid Design and Real Time products. J.A. 1457–58 ¶ 204 (emphasis included). This press release allegedly signaled to Schneider's customers that they would "be offered no other choice of competing products in the Schneider EMS Platform bundle." *Id.*

### D.  Procedural History

On January 11, 2008, Power Analytics filed its TAC— the operative complaint in this appeal. *Power Analytics*, 2018 WL 10231437, at *1. The TAC is substantially similar to Power Analytics' Second Amended Complaint. It alleges Sherman Act § 1 claims against ETAP, OSI, and Schneider, § 2 claims against ETAP, and state law claims against ETAP, OSI, and Schneider predicated on the same allegedly anti-competitive conduct.

### 1.  The Alleged Sherman Act Violations

The TAC first alleges that OSI and ETAP, through the OSI-ETAP Agreement, violated § 1 of the Sherman Act. According to the complaint, the OSI-ETAP Agreement is exclusionary and illegally restrains trade in the NUPIC Markets.  J.A. 1506 ¶¶ 70–80; J.A. 1509 ¶ 90; JA. 1511 ¶ 95; J.A. 1516 ¶ 113; J.A. 1559 ¶ 257.  Citing to the Term Sheet and the MOU, the TAC suggests that the OSI-ETAP Agreement prevents customers from switching to Power Analytics' products via an alleged duplicative license.  J.A. 1509–10 ¶¶ 91, 93–94.  The TAC also maintains that OSI is obligated to exclusively "recommend and promote ETAP Products as a preferred power systems analysis and management platform."  J.A. 1500 ¶¶ 60–61; J.A. 1510 ¶ 94.  It concludes that the OSI-ETAP Agreement has had a "direct, substantial adverse effect on competition," including: (1) foreclosing competition from lower cost, higher quality products and services in those markets; (2) reducing customer choice within those markets; (3) foreclosing innovation in those markets; and (4) reducing consumer welfare. *Power Analytics*, 2018 WL 10231437, at *11 (citing J.A. 1558 ¶ 251).

The TAC also alleges that Schneider and ETAP, through the Schneider-ETAP Agreement, violated § 1 of the Sherman Act.  The TAC maintains that the Schneider-ETAP Agreement illegally restrains trade in the EMS Platform Market.  *Id.* (citing J.A. 1562 ¶ 272).  Citing to Schneider's 2015 press release, the TAC contends that the Schneider-ETAP Agreement requires Schneider to "exclusive[ly]" rely on ETAP's Grid Design products.  J.A. 1544–46 ¶¶ 198, 204.  The TAC alleges that the agreement has "harmed competition by denying end use[r] customers access to price competition and innovative products offered by Power Analytics and other competitors for the sale of Power Grid D and M Products to the EMS Platform Market." *Power Analytics*, 2018 WL 10231437, at *11 (citing J.A. 1561 ¶ 267).

Finally, the TAC contends that ETAP has violated § 2 of the Sherman Act through its monopolization and attempted monopolization of the NUPIC Grid Design Market. *Power Analytics*, 2018 WL 10231437, at *12 (citing J.A. 1564 ¶¶ 284, 286). The TAC alleges that, by virtue of its 97 percent share of the market, ETAP has monopoly power over this market. According to the TAC, the OSI-ETAP Agreement constitutes "predatory conduct" that violates § 2 of the Sherman Act. J.A. 1564 ¶¶ 284–85. The TAC accuses ETAP's "exclusionary, anticompetitive conduct" of harming Power Analytics' sales and profits, its ability to develop economies of scale to permit it to compete in the market, and its ability to offer new and innovative products. J.A. 1564 ¶ 289–90. The TAC argues that the combination of the OSI-ETAP Agreement, ETAP's monopoly power, and the high cost of initial and recurring NUPIC audits "has made it impossible for Power Analytics or any other competitor to obtain the economies of scale necessary to offer existing, new and innovative products to customers in the NUPIC Grid Design Market." J.A. 1563 ¶¶ 278–81. "The anticompetitive effects of ETAP's conduct outweighs any possible procompetitive justifications for its actions." J.A. 1564 ¶ 288

### 2. The Motion to Dismiss Proceedings

On February 8, 2018, Schneider filed a motion to dismiss the TAC. *Power Analytics*, 2018 WL 10231437, at *1. ETAP and OSI brought parallel motions. The defendants argued, in part, that the OSI-ETAP and Schneider-ETAP Agreements were not "exclusive deal[ing]" arrangements actionable under § 1. J.A. 1661. Notably, in defending against motions to dismiss the Original, First, and Second Amended Complaints, Appellant defended these complaints by also characterizing them as alleging exclusive dealing arrangements and cited case law governing such arrangements. J.A. 691–93. In support of their motions as to the TAC, ETAP and OSI submitted a declaration attaching four documents discussed in the TAC: (1) the OSI

Umbrella Partnership Agreement (the "Umbrella Partnership Agreement"); (2) the Partner Program OEM Addendum (the "Addendum"); (3) the MOU; and (4) the Term Sheet. *Power Analytics*, 2018 WL 10231437, at *11.

As it had in connection with the motions to dismiss its earlier complaints, Power Analytics did not object to the defendants' characterization of its § 1 claims as "exclusive dealing" claims in its responsive briefing and, again, relied on exclusive dealing cases and nomenclature to defend its claims. Despite this, Power Analytics attempted to change course during oral argument, contending for the first time that the alleged § 1 violations were actually "refusals to deal," not exclusive dealing arrangements. J.A. 1994–1995. Counsel for Power Analytics explained to the district court that this change was prompted by a type of "ah ha" moment counsel had when preparing for argument. J.A. 1994 ("In giving this thought over the past couple of months, these agreements function as refusals to deal."). Based on this apparent enlightenment, Power Analytics reasoned that the district court should disregard Appellees' arguments regarding the § 1 claims because they relied on the wrong precedent. J.A. 1994. Appellees objected to Power Analytics' attempted course correction. J.A. 2011. They explained that the TAC only provided allegations of "exclusive dealing arrangements," J.A. 2012, as had the two complaints before it. The defendants then asked the court to allow for additional briefing if the court was inclined to consider Power Analytics' "refusal to deal" argument in connection with the § 1 claims. J.A. 2024.

On July 24, 2018, the district court granted the defendants' motions to dismiss the TAC, without prejudice. *Power Analytics*, 2018 WL 10231437, at *1. At the outset, the district court declined to address Power Analytics' "refusal to deal" arguments because it was a "new theory [that] ha[d] not been briefed by the parties." *Id.* at *1 n.1. The court then turned to the substantive arguments in the parties' briefs. The court explained that the § 1 claims were

deficient because they failed to plausibly allege the existence of (1) express or de facto exclusive dealing arrangements between ETAP and Schneider or ETAP and OSI; (2) harm to competition in either the EMS Platform Market or the NUPIC Grid Design Market; (3) foreclosure of competition in the NUPIC Real Time Market[2]; or (4) antitrust injury. *Id.* at *14–23. As to the § 2 claims, the court concluded that the complaint failed to plausibly allege either that ETAP engaged in anticompetitive conduct or had caused an antitrust injury. *Id.* at *23–24. The court dismissed the state law claims because it found them to be dependent upon the anti-competitive acts it found were inadequately alleged in connection with the antitrust claims. *Id.* at *24–25.

Rather than amend, Power Analytics filed a notice of intent not to file an amended complaint and filed a notice of appeal to the Ninth Circuit Court of Appeals. J.A. 2049–2050. Appellees moved to dismiss for lack of jurisdiction. The Ninth Circuit agreed and transferred the appeal to us. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

We review an appeal of an order granting a motion to dismiss for failure to state a claim under the law of the regional circuit. *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012). The Ninth Circuit reviews a dismissal for failure to

---

[2]    The district court reasoned that the TAC does not plausibly allege substantial foreclosure of competition in the NUPIC Real Time Market because Power Analytics has neither sought nor obtained NUPIC certification for its Real Time products, and the TAC does not plausibly allege that ETAP has market power in the relevant market. *Power Analytics*, 2018 WL 10231437, at *21.

state a claim *de novo*. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Power Analytics raises three issues on appeal. It argues that (1) the district court's decision regarding Power Analytics' § 1 claims employed the wrong legal framework; (2) the district court erroneously concluded that the TAC fails to plausibly allege anticompetitive conduct sufficient to state a claim under § 2 or antitrust injury caused by that conduct; and (3) the district court erred in dismissing Power Analytics' state law claims. We address each issue in turn.

### A. Power Analytics' Sherman Act § 1 "Refusal to Deal" Argument is Waived

As a general matter, "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). *See also TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339 (Fed. Cir. 2010). Such a practice is essential to avoid surprising litigants on appeal with issues that were unbriefed or undeveloped before the district court, *Hormel v. Helvering*, 312 U.S. 552, 556 (1941). It is a practice we adhere to today.

Though Power Analytics argues on appeal that the district court "incorrectly recast" its allegations under the rubric of "exclusive dealing arrangements" as opposed to "refusals to deal," Appellant Br. 15–17, Power Analytics was complicit in inviting the district court to consider its claims as exclusive dealing ones. Power Analytics' original and amended complaints repeatedly characterized the accused agreements as "exclusive dealing arrangements." J.A. 88, 373, 389, 392, 429–30, 842, 851. It never objected to Appellees' or the district court's discussion of "exclusive dealing arrangements" during the proceedings on the first three motions to dismiss. J.A. 2011 ("[Mr. Stockinger:] I think I should start with this idea now that the claim being put forward is a refusal to deal and not an exclusive dealing claim. We have now gone through four complaints and

three amendments.  And we have never before heard that this claim is actually about a refusal to deal.").  And, when faced with Appellees' briefing on the motions to dismiss the first amended complaint, Power Analytics actually relied on case law addressing exclusive dealing arrangements in the context of § 1 in its responsive briefs.  J.A. 691–93.  It was not until the hearing on the last motion to dismiss that Power Analytics sprang its new § 1 theory, governed by potentially different authority.  And so, unsurprisingly, the district court declined to address Power Analytics' "new basis," undeveloped by the parties.  *Power Analytics*, 2018 WL 10231437, at \*1 n.1.  Given the extensive history of this case, and the fact that this "refusal to deal" issue appeared only as a Hail Mary during argument, the district court's treatment of the issue was proper.

Power Analytics argues that it has not waived this issue on appeal because its "invocation of the refusal to deal description did not alter the substance of the [§ 1] claims or the theory of recovery."  Appellant Reply Br. 7.  It maintains that this "refusal to deal" argument cannot be considered a "new theory" because "[t]he agreements are the same; the parties to the agreements are the same; and the purpose and effect of the agreements . . . is unchanged."  Appellant Reply Br. 6.  But Power Analytics conflates the allegations of a complaint with the arguments raised by a party in opposition to a motion to dismiss those allegations.  Certainly, a complaint need not plead every potential legal theory or basis for relief under § 1 of the Sherman Act.  A party may not, however, ambush the court with new legal theories after briefing on a motion to dismiss is completed.  To rule otherwise would obviate the purpose of briefing.[3]  A

---

[3]    Indeed, the district court had no obligation to hold argument on Appellees' fourth motion to dismiss—it could have resolved the motion on the briefs alone.  Under those

district court, moreover, has no obligation to craft arguments or theories on a plaintiff's behalf to help counter a motion to dismiss. It must be able to rely on what the plaintiff says its theory of liability is.

We conclude that Power Analytics "refusal to deal" argument is "an issue not passed upon below" and decline to address it on appeal. *Singleton v.* Wuff, 428 U.S. 106, 120 (1976). *See also Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867 (9th Cir. 2013) (limiting its review to those addressed by the district court); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1050 n.1 (9th Cir. 2001) ("[W]e limit our review to issues argued in a party's opening brief."). Power Analytics' new theory had "not been briefed by the parties" and is thus waived. *Power Analytics*, 2018 WL 10231437, at *1 n.1. And, because Power Analytics concedes that the merits of the district court's opinion under the "exclusive dealing arrangements" framework are "irrelevant" to the § 1 issues on appeal, we need not even address the detailed § 1 analysis actually undertaken by the district court.[4] *See Power Analytics Corp. v. Operation*

---

circumstances, Appellees' argument would never even have been floated to the court.

[4]    While we decide this appeal with respect to the § 1 claims on the basis of waiver, we do not suggest that Power Analytics' new "refusal to deal" theory is any less flawed than the one it abandoned. A § 1 violation requires concerted action, and the TAC does not allege that ETAP, OSI, and Schneider collectively agreed to boycott Power Analytics. *Cf. United States v. Gen. Motors Corp.*, 384 U.S. 127, 136 (1996) (considering a boycott in which evidence demonstrated that General Motors "confronted" multiple dealers to "elicit[] from each dealer a promise not to do business with . . . discounters" to avoid price competition). Rather, read generously, the allegations state that OSI and

*Tech., Inc.*, No. 19-1805, Oral Arg. at 4:20–5:08, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-1805.mp3 ("[The Court:] [W]e need not resolve whether or not the court got the exclusive dealing portion of the opinion correct, is that right? [Power Analytics:] No your honor, I do think that is irrelevant, that's right.").[5]

### B. Power Analytics' Third Amended Complaint Fails to Plausibly Allege a Violation of Sherman Act § 2

As relevant here, to assert a cause of action under § 2 of the Sherman Act, a claimant must plausibly allege one of two sets of circumstances.[6] First, a plaintiff may allege that (1) the defendant possesses monopoly power in the relevant market and (2) willfully acquired or maintained that power by engaging in anticompetitive conduct. *Verizon Comm'ns. Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*"). Second, a plaintiff may alternatively allege that (1) the defendant has engaged in

---

Schneider each individually refused to deal with Power Analytics and that ETAP benefited from those actions. These are single-firm actions, actionable, if at all, only under § 2. But Power Analytics did not assert § 2 claims against either Schneider or OSI.

[5] Though Power Analytics argues in its briefing that the district court erred by concluding that the TAC does not allege substantial foreclosure of competition in the NUPIC Real Time Market because no company is certified to offer NUPIC Real Time Products, that issue only arose in the context of its § 1 claims. It is, thus, mooted by Power Analytics' waiver of any substantive arguments in support of those claims.

[6] The TAC does not allege a § 2 conspiracy to monopolize.

anticompetitive conduct with (2) the specific intent to obtain monopoly power, and (3) that the defendant has a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). In both circumstances, the plaintiff must also plead an antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). The TAC purports to allege both causes of action against ETAP. Specifically, the TAC alleges that ETAP has monopoly power in the NUPIC Grid Design Market and maintains that power through predatory conduct, or, at the least, has attempted to monopolize that market through anti-competitive conduct.

The district court found that the TAC plausibly alleged both the existence of a relevant market for § 2 purposes and that ETAP possesses monopoly power in that market. ETAP does not challenge these findings on appeal. Despite these threshold findings in favor of Power Analytics, however, the court found that the TAC failed to plausibly allege that ETAP engaged in the type of anticompetitive conduct that is actionable under § 2 and failed to plausibly allege that an antitrust injury flowed from ETAP's conduct and market share. It is these latter two findings that Power Analytics challenges on appeal.

We find no error in the district court's conclusions on either point.[7]

---

[7] According to the concurrence, we need not reach the § 2 issues raised in Power Analytics' appeal. The concurrence contends that Power Analytics' refusal to deal argument on appeal pertains to both its §§ 1 and 2 claims, and accordingly, the court could have resolved the entire issue on waiver alone.

We cannot. Power Analytics' appeal pertaining to the § 2 dismissal does not hinge on the district court's failure to consider ETAP's anticompetitive conduct as refusals to

deal.  For example, Appellant's opening brief only discusses its refusal to deal argument in its § 1 discussion.  See Appellant Br. 15–17 ("When reviewed under the correct framework, (i.e., are there sufficient allegations of concerted action in restraint of trade in which the predatory conduct is a refusal to deal?) the ETAP-OSI and ETAP-Schneider agreements each satisfy the elements of a Section 1 violation."); id. at 19–20 ("[An exclusive dealing arrangement] is categorically not the type of anticompetitive agreement on which Plaintiff bases its Section 1 claim against ETAP and OSI.  The Complaint alleges a refusal to deal . . . ." (emphasis included)). The brief's § 2 discussion, on the other hand, focuses on the district court's holding that the TAC failed to "plausibly [] allege anticompetitive conduct that caused antitrust injury sufficient to state a claim" under § 2.  Appellant Br. 52.

ETAP, moreover, did not argue in its briefing that Power Analytics waived any arguments in connection with its § 2 claims.  This makes sense.  ETAP is a competitor of Power Analytics, not an entity with which it wants to deal. It is not ETAP's refusal to deal with it about which Power Analytics complains; it complains of ETAP's unwillingness to step aside and share a portion of its own market with Power Analytics.  While Power Analytics conceded that we need not review the district court's analysis of the OSI-ETAP and Schneider-ETAP Agreements under the "exclusive dealing" framework, it did so in the context of a discussion of its section 1 claims and did not suggest that its § 2 appeal rested entirely on the exclusive nature of the agreements.  See Oral Arg. at 4:20–5:08.  Indeed, the TAC points to ETAP's "stranglehold on the nuclear market" and its "lower quality, higher priced" Grid Design products as evidence of ETAP's anticompetitive conduct.    J.A. 1563 ¶¶ 281–82 ("ETAP's stranglehold on the nuclear market—of which ETAP's arrangement with OSI is a material cause—has made it impossible for Power Analytics or any

### 1. Anticompetitive Conduct

As noted, § 2 requires "an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407. This is a fundamental tenet of the Court's modern antitrust jurisprudence because "there is no duty to aid competitors." *Id.* at 411. Antitrust laws are intended to protect against harm to the *competitive process*, not merely harm to competitors. *Brooke Grp.*, 509 U.S. at 224. Thus, exclusionary conduct under § 2 must do more than reduce consumer welfare by raising prices or restricting output. *See Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free market system."). "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id.* at 408. *See also Pacific Bell Tel. Co. v. Linkline Comms., Inc.*, 555 U.S. 438, 448 (2009) ("*Linkline*") ("But there are rare instances in which a dominant firm may incur antitrust liability for purely unilateral conduct. For example, we have ruled that firms may not charge 'predatory' prices—below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses."). As the Ninth Circuit has explained, however, courts have been "very cautious in recognizing such exceptions." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (quoting *Trinko*, 540 U.S. at 408). Even at the "outer boundar[ies] of § 2 liability," the monopolist's course of dealing must suggest "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540

other competitor to obtain the economies of scale necessary to offer existing, new and innovative products to customers in the NUPIC Grid Design Market.").

We thus address the merits of the § 2 claims against ETAP.

U.S. at 409.  In other words, to constitute actionable predatory conduct, the defendant's actions must make no economic sense other than for the elimination of competition.  *See, e.g.*, *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect."); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (anticompetitive conduct is "conduct without a legitimate business purpose that makes sense only because it eliminates competition" (internal quotation marks omitted)).

Viewing the operative complaint through this lens, the district court was correct that the TAC contains no plausible allegations of exclusionary conduct.  *See Trinko*, 540 U.S. at 408.  The TAC only alleges that ETAP violated § 2 by entering into an agreement with OSI, whereby OSI and ETAP agreed to sell their products in conjunction with the other's.  The TAC says this eliminates ETAP's competitors from entering the NUPIC Grid Design Market because purchasers who want to use OSI's entrenched Historian Software have no choice but to also use ETAP's products.  But those allegations merely assert that ETAP entered into a strategic partnership with another supplier in order to advance the appeal of its own products and thereby maximize its sales and profits.  The Ninth Circuit has made clear that such efforts, by themselves, do not constitute exclusionary conduct.  *Metronet Servs.*, 383 F.3d at 1133.  Conduct by a supplier that serves to make its products "more attractive to buyers, whether by reason of lower manufacturing cost and price or improved performance" does not qualify as exclusionary.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010) (quoting *Cal. Comput. Prods., Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979)).  *See also Novell*, 731 F.3d at 1076 ("[R]efusal to deal doctrine specifically and section 2 generally seek to protect, not penalize, such prosaic profit-maximizing (and presumptively pro-

competitive) conduct by independently operating firms, even dominant firms.").

Importantly, the OSI-ETAP Agreement, which the TAC characterizes as "predatory conduct," is not even an exclusive agreement. J.A. 1564 ¶ 285. As the district court observed:

> Section 1.1 of the Addendum states that ETAP is a "nonexclusive" Original Equipment Manufacturer ("OEM") for OSI's products. Ex. B to Stockinger Decl. (Addendum) § 1.1. Section 1.2 of the Addendum states that OSI grants to ETAP a "non-exclusive nontransferable license" to distribute OSI's products. *Id.* The remaining two documents, the MOU and the Term Sheet, reiterate these terms. *See* Ex. C to Stockinger Decl., Dkt. 392-1 at 30 ("OSIsoft agrees to grant ETAP a nonexclusive, non-transferrable license to distribute and license the OSIsoft Products only in combination with ETAP Products."); *see also* Ex. D to Stockinger Decl., Dkt. 392-1 at 39 (same).

*Power Analytics*, 2018 WL 10231437, at \*11. The incorporated documents establish that ETAP and OSI have no obligation to exclusively promote each other's products, and plainly contradict the TAC's allegations that OSI and ETAP software customers are precluded from selecting substitute competitor products.[8]     *Id.*     Indeed, they

---

[8]     We also reject Power Analytics' argument that the district court's review of the Umbrella Partnership Agreement and the Addendum, the MOU, and the Term Sheet was erroneous because a "review of materials outside the pleadings violate[s] Ninth Circuit law." Appellant Br. 23 (citing *Kohja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)). It is well-established that a district court may consider documents that are incorporated by reference

anticipate that OSI might partner with competing suppliers. *Id.* at *18. Thus, despite Appellant's arguments otherwise, ETAP's accused conduct does not meet the minimum threshold to establish predatory behavior.

Power Analytics' claim that ETAP's products are of a "lower quality" and are "higher priced" does not remedy this deficiency. J.A. 1563 ¶ 282. The sale of inferior or higher priced products is not predatory conduct. Assertions of "superiority" have little significance when "the free market and not a judge or a jury decides whose products are inferior" or preferable. *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 378 (7th Cir. 1986). Power Analytics, moreover, has provided no evidence that ETAP used its monopoly power to force nuclear

---

in the allegations. *Khoja*, 899 F.3d at 998, 1002 (explaining that documents may be properly incorporated "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim"). Each of the documents considered by the district court qualify as incorporated documents. The Umbrella Partnership Agreement, dated November 4, 2013 and signed by OSI and ETAP, includes the terms and conditions of the allegedly "anticompetitive" agreement, as detailed in the TAC. J.A. 1669–72. The TAC also quotes language from the MOU and characterizes certain provisions of the Term Sheet to support its allegations of anticompetitive conduct. J.A. 1510 ¶¶ 92, 94. In fact, Power Analytics' own opening brief supports the district court's view that these documents were incorporated into the TAC. *See, e.g.*, Appellant Br. 27 ("The Complaint references elements of the MOU, UPA, and Term Sheet to provide circumstantial facts supporting . . . that the ETAP-OSI agreement included a commitment . . . to refuse to deal . . . ."). We find no error in the district court's application of this doctrine.

facilities to adopt its products.  As discussed above, the incorporated documents "are inconsistent with the allegation that the agreement includes 'unreasonable impediments and conditions intended to preclude and/or deter' NUPIC customers from substituting in [Power Analytics'] products for those of OSI and ETAP." *Power Analytics*, 2018 WL 10231437, at \*17–18.  "Absent evidence of such compulsion, the only rational inference that can be drawn from some consumers' adoption of [ETAP's product] is that they regarded it to be a superior product." *Allied Orthopedic*, 592 F.3d at 1002.

Similarly, Power Analytics' continued reference to ETAP's intent to "kill competition" is irrelevant.  Appellant Br. 54.  Courts have regularly explained that there is no duty to aid competitors and that "[s]tatements of an innovator's intent to harm a competitor . . .  are insufficient by themselves to create a jury question under Section 2." *Allied Orthopedic*, 592 F.3d at 1001.  "Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).  In this case, ETAP's memo discusses no interest in restricting competition in the industry; it only expresses a desire to defeat ETAP's competitors. J.A. 1508 ¶ 85.  And, it proposes no conduct such as below-"cost" pricing, that would make no economic sense other than for purposes of eliminating competition.

Finally, the TAC asserts that "[t]he anticompetitive effects of ETAP's conduct outweighs any possible procompetitive justifications for its actions."  J.A. 1564 ¶ 288.  Through this conclusory statement, Power Analytics seems to suggest that any procompetitive benefit is "outweighed" by the loss of competition in the alleged NUPIC Markets.  While the D.C. Circuit once suggested in *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001), that "if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the

anticompetitive harm of the conduct outweighs the procompetitive benefit," the Ninth Circuit has rejected resorting to such balancing tests in place of the statute's requirement for anticompetitive conduct.  It has made clear that, after *Trinko*:

> There is no room in this analysis for balancing the benefits or worth of a product improvement against its anticompetitive effects . . . To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable . . . The balancing test proposed by plaintiffs would therefore require courts to weigh as-yet-unknown benefits against current competitive injuries.  Our precedents and the precedents we have relied upon strongly counsel against such a test.

*Allied Orthopedic*, 592 F.3d at 1000.  Accordingly, we decline to adopt Power Analytics' proposed balancing test here.

We find that the district court correctly dismissed the § 2 claims based on their failure to plausibly allege that ETAP engaged in actionable anticompetitive—*i.e.*, "predatory"—conduct.

### 2. Antitrust Injury

"Congress designed the Sherman Act as a 'consumer welfare prescription.'" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979).  As we describe above, it is axiomatic that "[t]he antitrust laws . . . were enacted for 'the protection of *competition* not *competitors*.'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis in original)).  Thus, in order to state a claim for an antitrust violation, under either § 1 or § 2, a private plaintiff must, adequately plead an impact on competition.  This is also known as "antitrust injury."  The Ninth Circuit has held that antitrust injury requires

"(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999)).

We agree with the district court that Power Analytics failed to plead antitrust injury in support of its § 2 claims. From the outset, Power Analytics cannot demonstrate antitrust injury because the TAC does not plausibly allege that ETAP engaged in "unlawful conduct." As we discuss above, ETAP's prior conduct only demonstrates an interest in defeating its competitive rival and its agreement with OSI contains no anticompetitive elements. These allegations are not sufficient to demonstrate § 2 predatory conduct. *See Aerotec Int'l*, 836 F.3d at 1184 ("While it is true that intent is a necessary element of attempted monopolization, it is not sufficient alone to establish liability.").

Even assuming the TAC sufficiently pleads unlawful conduct, moreover, it still fails to allege injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Antitrust injury must "flow" from "a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum, Inc.*, 495 U.S. 328, 343–44 (1990) ("*ARCO*") (emphasis added). The TAC, however, does not sufficiently plead that ETAP's behavior was "competition-reducing." For example, the plain text of the incorporated documents explicitly characterize the OSI-ETAP Agreement as a "non-exclusive" agreement. *Power Analytics*, 2018 WL 10231437, at \*11 (citing J.A. 1670–98). The OSI-ETAP Agreement does not limit the types of products or services the contracting parties may offer to consumers or prohibit them from promoting the products of other competitors. *Id.* And it does not place any price restrictions on their services. *Id.* While Power Analytics may feel aggrieved by

ETAP's unwillingness to cede some of its market share to it, there is simply no evidence that ETAP's agreement with OSI caused injury to *competition*. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury.").

We acknowledge the TAC's assertions that ETAP's behavior has: (1) "reduced output in the form of new products and functionality"; (2) "stifled innovation and customer choice,": and (3) "de facto eliminated any source of price competition." J.A. 1429–30 ¶ 116. But these are conclusions, not facts. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Upon review of the TAC for the supporting factual allegations, we discover that: (1) there is no claim that product and service availability to consumers has declined; (2) "stifled innovation" and "choice" only mean that *Power Analytics* has lost customers to competition (J.A. 1462 ¶¶ 218–19); and (3) "de facto elimination of price competition" means that consumers have continued to purchase Appellees' products, despite Power Analytics' alleged lower prices (J.A. 1459–60 ¶¶ 209–10). Such allegations fall short of establishing antitrust injury. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) ("Conduct that merely harms competitors . . . while not harming the competitive process itself, is not anticompetitive."). Though ETAP's partnership with OSI may have helped it secure a more dominant market position and harmed a competitor's business, "[Power Analytics'] injury does not correspond to any allegedly anticompetitive effect on the market but rather a truly competitive one." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007).

In the absence of adequate pleadings regarding the existence of antitrust injury, the "injury" about which Power Analytics complains does not sound in antitrust.

### C.  Power Analytics' State Law Unfair Competition and Antitrust Claims Were Properly Dismissed

Power Analytics next argues that the district court erred when it dismissed Power Analytics' state law antitrust claims "[b]ecause the complaint pleaded a valid claim under the Sherman Act against each defendant." Appellant Br. 56. As explained above, however, Power Analytics' § 1 arguments are waived and the TAC did not plausibly allege § 2 violations. Accordingly, we conclude that the district court did not err when it dismissed Power Analytics' state law antitrust claims.

Power Analytics also argues that the district erroneously dismissed Power Analytics' common law claim for Tortious Interference with Prospective Economic Advantage by dismissing the relevant allegations as "conclusory." Appellant Br. 57–58. Power Analytics maintains that, because the district court was reviewing those allegations of fact at the 12(b)(6) stage, it should have accepted all the allegations as true. But this reflects a misunderstanding of the Rule 8 pleading standard. To avoid an unnecessary expenditure of time and resources, particularly in antitrust cases, district courts should "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 557–58. The TAC's allegations regarding Power Analytics' tortious interference claim constitutes one paragraph:

> Since the inception of this anticompetitive Agreement, Power Analytics has lost four existing NUPIC Market customers: Duke Energy, Enercon, Atomic Energy of Canada and Energy Northwest, representing more than 35% of its pre-ETAP OSI Agreement installed customer base, who on information and belief, have all switched from Power

> Analytics as a direct result of OSI and ETAP's anticompetitive agreement and related anticompetitive actions to ETAP.

J.A. 1515–16 ¶ 112. The complaint offers no further explanation or detail as to what "information and belief" supports its allegation that Power Analytics lost four existing NUPIC Market customers due to the OSI-ETAP Agreement. Because Power Analytics fails to allege sufficient facts to "nudge [its] claim[] across the line from conceivable to plausible," its claim must be dismissed. *Twombly*, 550 U.S. at 570.[9]

### III. CONCLUSION

For these reasons, the district court's opinion and order dismissing Power Analytics' Third Amended Complaint is affirmed.

### AFFIRMED

### COSTS

Costs to Appellees.

---

[9]    In addition, a tortious interference claim requires an allegation of an independently wrongful act. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Because the TAC fails to plausibly allege a Sherman Act violation, Power Analytics' corresponding tortious interference claim fails.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**POWER ANALYTICS CORPORATION,**
*Plaintiff-Appellant*

**v.**

**OPERATION TECHNOLOGY, INC., DBA ETAP, OSISOFT, LLC, SCHNEIDER ELECTRIC USA, INC.,**
*Defendants-Appellees*

_____

2019-1805

_____

Appeal from the United States District Court for the Central District of California in No. 8:16-cv-01955-JAK-FFM, Judge John A. Kronstadt.

_____

MOORE, *Circuit Judge*, concurring in judgment.

I concur in the court's conclusion that Power Analytics waived its refusal to deal argument, but would find this waiver alone sufficient to resolve Power Analytics' Section 1 and Section 2 antitrust claims on appeal.

Power Analytics alleged only an exclusive dealing theory in its original and amended complaints. Given Power Analytics' clear choice, the district court assessed the Third Amended Complaint (TAC) under an exclusive dealing framework and expressly held against Power Analytics for both its Sherman Act Section 1 and Section 2 claims. *See*

*generally Power Analytics Corp. v. Operation Tech., Inc.*, No. 16-1955, 2018 WL 10231437 (C.D. Cal. July 24, 2018). The district court expressly declined to consider Power Analytics' unbriefed refusal to deal argument, raised for the first time at the motion to dismiss hearing for the TAC. *Id.* at *1 n.1. Power Analytics confirmed at oral argument that it is not challenging the district court's analysis of either its Section 1 or Section 2 claims under the exclusive dealing framework, leaving only Power Analytics' refusal to deal argument for us to consider. *See Power Analytics Corp. v. Operation Tech., Inc.*, No. 19-1805, Oral Arg. at 4:20–4:51, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-1805.mp3. I see no error in the district court's decision that Power Analytics' refusal to deal theory was a new, unbriefed theory and therefore waived. The district court, in an abundance of generosity, expressly permitted Power Analytics to cure this defect through subsequent amendment which Power Analytics chose not to pursue. Under these circumstances, I would not be willing to decide this waived issue on appeal. Because Power Analytics does not challenge the district court's decision on the exclusive dealing theory and I see no error in the district court's decision not to address the refusal to deal theory, I would affirm.